[L.A. No. 30079. In Bank. July 30, 1973.]

ANTONIA GUERRERO et al., Plaintiffs and Appellants, v.
ROBERT CARLESON, as Director, etc., et al.,
Defendants and Respondents.

## COUNSEL

George M. Duff for Plaintiffs and Appellants.

Ralph Santiago Abascal, Jay-Allen Eisen and Phil Goar as Amici Curiae on behalf of Plaintiffs and Appellants.

Evelle J. Younger, Attorney General, Elizabeth Palmer, Assistant Attorney General, Edward M. Belasco and Jerold A. Prod, Deputy Attorneys General, John D. Maharg, County Counsel, and Louis B. Hays, Deputy County Counsel, for Defendants and Respondents.

## OPINION

**MOSK, J.**—Plaintiffs appeal from an order denying their application for a preliminary injunction prohibiting the directors of the State Department of Social Welfare and the Los Angeles County Department of Public Social Services from reducing or terminating welfare payments to recipients who defendants know are literate in Spanish but not in English, unless notice of such reduction or termination was given in the Spanish language.

The sole issue is whether the welfare authorities are compelled by the Constitution to prepare such notices in Spanish. We conclude that although in appropriate cases the use of Spanish in these and similar notices would be desirable and should be encouraged, it does not rise to the level of a constitutional imperative.

The named plaintiffs are three individuals[1] who had been receiving Aid to Families with Dependent Children (AFDC), a federal-state-county funded categorical assistance program. (42 U.S.C. § 601 et seq.; Welf. & Inst. Code, § 11200 et seq.) Under applicable regulations, recipients of such assistance are entitled to receive "timely and adequate" notice of any proposed reduction or termination of benefits. "Timely" is defined to require that the notice be mailed to the recipient at least 15 days before the action is taken; "adequate" means that the notice must include, inter alia, a written explanation of the reasons for the proposed action, of the recipients' right to request a "fair hearing," and of the fact that benefits will continue to be paid throughout the hearing period if the request for the hearing is made within 15 days. (45 C.F.R. § 205.10; State Department of Social Welfare, Manual of Policies and Procedures: Eligibility and Assistance Standards, § 22-000 et seq. (hereinafter SDSW Manual).)[2]

The complaint alleged that defendants sent notices of reduction or termination of benefits in the English language to plaintiffs; that plaintiffs were unable to read such notices because they are literate only in Spanish; and that plaintiffs failed for this reason to request a fair hearing within the appropriate period, resulting in immediate reduction or termination of their benefits. Although constituting a general denial of plaintiffs' right to relief, the answer admitted that defendants did print some welfare forms in Spanish. It was also stipulated between the parties that the Los Angeles County welfare authorities knew the individual plaintiffs in this case did not speak or read English but did speak and read Spanish; that the authorities routinely make an effort to determine if a recipient is literate in Spanish but not in English; and that if it is learned such is the case, the language handicap is conspicuously noted on the recipient's file.

■ Plaintiffs' contention — that defendants are constitutionally mandated to give reduction or termination notices in Spanish to those welfare recipients known to be literate in that language but not in English—is based primarily on the due process clause. Plaintiffs concede there is no direct authority for this proposition, but rely rather on *Goldberg* v. *Kelly* (1970) 397 U.S. 254 [25 L.Ed.2d 287, 90 S.Ct. 1011], and its progeny. In *Goldberg* the United States Supreme Court held the due process clause requires that a welfare recipient be afforded an evidentiary hearing before as well as after termination of benefits. In the course of its opinion the court ob-

---

[1] A welfare rights organization is also joined as a party plaintiff. For convenience, however, the word "plaintiffs" as used herein will refer to the individual plaintiffs only.

[2] The request may be made after expiration of that period, but in such event the reduction or termination of benefits will be effective throughout the review process.

served that the recipient must be given a "timely and adequate" hearing notice (*id.* at p. 267 [25 L.Ed.2d at pp. 298-299]), but did not spell out the contents thereof in any detail. The notice actually furnished under the New York City law challenged in *Goldberg* consisted of a letter to the recipient followed by a conference with a caseworker. Of this procedure the court merely said, "Nor do we see any constitutional deficiency in the content or form of the notice." (*Id.* at p. 268 [25 L.Ed.2d at p. 299].) Despite the fact that New York City has a large Spanish speaking population,[3] there is no indication the notice was given in that language to recipients who were literate only in Spanish. Certainly the high court did not hold in *Goldberg* that a termination notice to Spanish speaking recipients is constitutionally inadequate unless it is prepared in that language.

Seeking additional support, plaintiffs turn to both a general and a specific authority on the law of notice. The former is *Mullane* v. *Central Hanover Tr. Co.* (1950) 339 U.S. 306 [94 L.Ed. 865, 70 S.Ct. 652], from which plaintiffs quote certain well-known passages on the adequacy of notice necessary to satisfy due process.[4] We have no quarrel with the general principles there enunciated, but they are of little assistance in solving the particular problem at hand. Whether the notice here given was calculated "under all the circumstances" to convey the required information obviously depends on an appraisal of those circumstances, an inquiry we shall pursue *infra*.

The specific authority relied on by plaintiffs is *Covey* v. *Town of Somers* (1956) 351 U.S. 141 [100 L.Ed. 1021, 76 S.Ct. 724], in which a notice of judicial foreclosure for delinquency in paying real property taxes was sent to a propery owner whom the authorities knew was mentally incompetent and unable to understand the meaning of any such communication. Shortly after foreclosure the property owner was certified to be a person of unsound mind and was committed to a state hospital for the insane, and a guardian of her person and property was appointed. Reversing the foreclosure judgment, the United States Supreme Court quoted the fore-

---

[3]In addition, the recipients individually named in the opinion (*id.* at p. 256, fn. 2 [25 L.Ed.2d at pp. 292-293]) bore Spanish surnames.

[4]"An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. [Citations.] The notice must be of such nature as reasonably to convey the required information [citation], and it must afford a reasonable time for those interested to make their appearance, . . . [W]hen notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." (*Id.* at pp. 314-315 [94 L.Ed. at pp. 873-874].)

going language of *Mullane* (*ante,* fn. 4) and ruled that "Notice to a person known to be an incompetent who is without the protection of a guardian does not measure up to this requirement [of due process]." (*Id.* at p. 146 [100 L.Ed. at p. 1026].)

We agree with this application of the *Mullane* principles, but we cannot fairly equate plaintiffs' knowledge of Spanish rather than English with an unsoundness of mind justifying appointment of a legal guardian. An incompetent may be unable to understand an official notice no matter how it is explained to him. By contrast, the plaintiffs in the case at bar are in full possession of their mental faculties and are admittedly literate in Spanish; accordingly, they are able without question to understand a *translation* of the notice into that language. The issue, therefore, is whether governmental agencies can reasonably believe that upon receiving the notice plaintiffs will seek and obtain such a translation.[5]

The United States is an English speaking country. Despite California's early Spanish culture, the language of our state government has long been that of the waves of American settlers who migrated here when California joined the Union. Although a declaration that all official writings shall be in the English language (former Cal. Const., art. IV, § 24) was deleted as surplusage in the 1966 revision of our Constitution, section 8 of the Welfare and Institutions Code still provides, as do many of our codes, that "Whenever any *notice,* report, statement, or record is required or authorized by this code, it shall be made in writing *in the English language.*" (Italics added.) Justice Holmes declared a half-century ago "it is desirable that all citizens of the United States should speak a common tongue." (*Meyer* v. *Nebraska* (1923) 262 U.S. 390, 412 [67 L.Ed. 1042, 1051, 43 S.Ct. 625, 29 A.L.R. 1446] (dissenting opinion).) And this court recently recognized that "The state interest in maintaining a single language system is substantial . . . ." (*Castro* v. *State of California* (1970) 2 Cal.3d 223, 242 [85 Cal.Rptr. 20, 446 P.2d 244].)

It is a truism that life is more difficult in an English speaking country for a person who does not speak English; indeed, it would likewise be more difficult for an American living in Mexico who does not speak Span-

---

[5]It may be noted in passing that plaintiffs fail to answer a preliminary issue raised in defendants' brief: learning a new language is a process, not an event. When a non-English speaking person is exposed to the English language, whether by formal study or simply by living in an English speaking environment, he will ordinarily pass through a long gradation of proficiency beginning with the time he knows only his native tongue until he becomes fully bilingual. At what point in that scale does "literacy" in English start and plaintiffs' claimed right to notices in their own language end?

ish. But the difficulty is not limited to understanding a notice of reduction or termination of welfare benefits. It may be felt, in addition, each time the person finds it necessary to deal with fellow citizens—e.g., when he seeks to rent an apartment or buy a house, to purchase food at a grocery or clothing at a department store, to obtain medical care, or to apply for a job. It may also be felt whenever the person has a need to deal with the government or its agencies—e.g., when he seeks to apply for immigration or citizenship, to obtain a driver's permit, to be licensed to conduct a business, to fill out tax forms, or to qualify for social security or unemployment insurance benefits. The government may therefore reasonably assume that such individuals experience strong and repeated incentives either to learn the English language or to develop a reliance on bilingual persons who can translate for them when necessary.

It is also reasonable to assume that in contemporary urban society the non-English speaking individual has access to a variety of such sources of language assistance. To begin with, he may turn to members of his family, friends, or neighbors, who were either born in this country or received some schooling here.[6] If these prove inadequate or unavailable, he may contact representatives of governmental agencies[7] or private organizations devoted to (1) counselling immigrants, (2) assisting particular nationalities, linguistic groups, trades or professions, (3) protecting individual rights to welfare or other governmental benefits, or (4) furnishing legal aid to the poor.[8]

Finally, the government may reasonably assume that the non-English speaking individual will act promptly to obtain such assistance when he receives the notice in question. We have examined the various forms of notice employed in this case: each is printed on letterhead of the Department of Social Services of Los Angeles County; each is personally addressed to the individual plaintiff, by name, address, and case number; each is obviously an official communication, with boxes checked and blanks filled in by hand; and each is dated and signed by a social worker or similar

---

[6]Thus the social worker assigned to the case of Mrs. Varela, one of the plaintiffs in this proceeding, declared in an affidavit that his client has at least three teenage children in her household who speak and read English, and who heard the explanation given to Mrs. Varela concerning her pending reduction in benefits.

[7]For example, the social workers assigned to the cases of two of the present plaintiffs each declared in affidavits that they speak Spanish fluently and gave lengthy explanations in that language to their clients concerning their pending reductions in benefits.

[8]Thus plaintiff Varela declared in her affidavit that she took her notice of reduction in benefits to the "State Service Center" in Los Angeles where a law student explained its meaning in Spanish and helped her prepare papers requesting a hearing.

departmental representative. Plaintiffs repeatedly emphasize that welfare payments play a crucial role in their daily lives. We have no doubt this is so. For the same reason, however, it may fairly be assumed that a welfare recipient would not be so disinterested in his family's livelihood as to simply ignore an official document delivered in the mail which has every appearance of relating to his right to receive public assistance payments.

After reciting the above-quoted (*ante,* fn. 4) demands of the due process clause on governmental notices, the *Mullane* court explained (at pp. 314-315 of 339 U.S. [94 L.Ed. at pp. 873-874]): "But if with due regard for the practicalities and peculiarities of the case these conditions are reasonably met, the constitutional requirements are satisfied. 'The criterion is not the possibility of conceivable injury but the just and reasonable character of the requirements, having reference to the subject with which the statute deals.' [Citations.]" In view of the foregoing "practicalities and peculiarities" of the case at bar, we conlude that it is not unreasonable for the state to expect that persons such as those in plaintiffs' position will promptly arrange to have someone translate the contents of the notice here challenged.[9] Accordingly, prior governmental preparation of that notice in Spanish is not a constitutional imperative under the due process clause.

In somewhat desultory fashion plaintiffs also contend the present system violates equal protection principles. It is argued that to send notices of reduction or termination of welfare benefits in English to recipients known not to be literate in that language is arbitrarily to discriminate against them by creating "a class of recipients who are to be denied aid without being duly and properly informed of the same." The argument begs the question. If, as we hold herein, the notice as now given is constitutionally adequate under all the circumstances, plaintiffs are not denied "due" and "proper" information affecting their right to aid.

Plaintiffs' reliance in this connection on *Castro* v. *State of California* (1970) *supra,* 2 Cal.3d 223, is misplaced. We there held it would violate the equal protection clause to apply the English literacy voting qualification (former Cal. Const., art. II, § 1) to persons who are literate only in Spanish, yet have access to substantial sources of political information in that language. In so holding, nevertheless, we specifically rejected any suggestion that the state was required by the equal protection clause to provide such persons with ballots and election materials *printed in Spanish*: "Whether such a radical reconstruction of our voting procedures is constitutionally

---

[9]It is apparent that such persons, by definition, were able to obtain whatever assistance was necessary to permit them to qualify for welfare benefits in the first place.

compelled, however, is a separate question. It is clear that the goal of efficient and inexpensive administration, while praiseworthy, cannot justify depriving citizens of fundamental rights. But this does not imply that the state must not only provide all qualified citizens with an equivalent opportunity to exercise their right to vote, but must also provide perfect conditions under which such right is exercised. . . . California is not required to adopt a bilingual electoral apparatus as a result of our decision today that it may no longer exclude Spanish literates from the polls. The state interest in maintaining a single language system is substantial and the provision of ballots, notices, ballot pamphlets, etc., in Spanish is not necessary either to the formation of intelligent opinions on election·issues or to the implementation of those opinions through the mechanics of balloting. It reasonably may be assumed that newly enfranchised voters who are literate in Spanish can prepare themselves to vote through advance study of the sample ballots *with the assistance of others capable of reading and translating them.*" (Italics added.) (*Id.* at p. 242.)

*Castro* can of course be distinguished on its facts, but the foregoing reasoning is equally applicable here. Indeed, we are faced with an a fortiori case: just as we recognized that our holding in *Castro* "will apply to any case in which otherwise qualified prospective voters, literate in a language other than English, are able to make a comparable demonstration of access to sources of political information" (*ibid.*), so also the rule sought by plaintiffs herein would reach far beyond the present facts. As plaintiffs candidly concede, a decision in their favor could not properly be limited to the AFDC program and the Spanish language, but would also apply (1) to Spanish speaking recipients under any of the other half-dozen categorical assistance programs and (2) to any other language—Chinese or Japanese, Russian or Greek, Tagalog or Samoan—in which a non-English speaking recipient of such assistance was known to be literate, regardless of how small that language group might be.

In addition, it is difficult to see why such a rule would not also extend to any and all official communications to the public required to satisfy due process of law, whether it be summonses, citations, subpoenas, tax forms, delinquency or eviction or foreclosure notices, announcements of public hearings—or, contrary to our assertion in *Castro,* ballots and election materials. Thus in *Carmona* v. *Sheffield* (N.D.Cal. 1971) 325 F.Supp. 1341, affd. per curiam (9th Cir. 1973) 475 F.2d 738, the federal district court dismissed as untenable an action by Spanish speaking citizens complaining they were denied equal protection because the state administered its unemployment insurance program in English only. The court said (at

p. 1342): "In essence, plaintiffs' contention would require the State of California and, presumably, all other States and the Federal Government to provide forms and to conduct its affairs and proceedings in whatever language is spoken and understood by any person or group affected thereby. The breadth and scope of such a contention is so staggering as virtually to constitute its own refutation. If adopted in as cosmopolitan a society as ours, enriched as it has been by the immigration of persons from many lands with their distinctive linguistic and cultural heritages, it would virtually cause the processes of government to grind to a halt. The conduct of official business, including the proceedings and enactments of Congress, the Courts and administrative agencies, would become all but impossible. The application of Federal and State statutes, regulations and proceedings would be called into serious question." Again the case may be distinguished on its facts, but its reasoning is apposite to our problem. (Cf. also *Lau* v. *Nichols* (9th Cir. 1973) 483 F.2d 791.)

We close by taking notice of certain rules and practices of defendant welfare authorities on the subject of adequate communication. In a basic policy declaration the State Department of Social Welfare has fully recognized the importance of communicating whenever possible in Spanish with recipients who speak only that language.[10] Other regulations require that upon a request for fair hearing the county welfare authorities notify the referee of any language disability of the claimant (§ 22-023.23), and that at the hearing an interpreter be provided if necessary (§ 22-049.7).[11] Fur-

---

[10]"The basic responsibility for providing prompt aid and service obviously includes effective communication. Many counties have large Spanish surname populations. For many of these people, Spanish is their primary language and English (if they speak it at all) is a second language. It is essential that documents explaining appeal rights be available in both English and Spanish in these counties. These documents should not only inform the client of his fair hearing rights but also of legal or related services in those counties where they are available.

"Communication is improved when clients see themselves reflected in agency personnel. Issues growing out of misunderstanding will be reduced if the client's expectancy of being understood is increased because there are people in the department who not only speak his language but who have similar backgrounds and are sensitive to his problems.

"Many counties are moving in this direction. They are developing forms and informational materials in Spanish and arranging Spanish language instruction for staff in the department on department time. Wherever possible, many counties are hiring qualified professional and clerical staff representative of minority groups. In addition, however, long-range planning will be necessary for counties to adequately increase staff proportion of both Spanish surname and other significant ethnic minorities." (SDSW Manual, § 22-203.3.)

[11]Plaintiffs mistakenly rely, however, on a regulation (§ 22-021.2) which requires that the notice of the right to request a fair hearing be written "in language understandable" to the recipient. As the regulation does not say "in *a* language understand-

thermore, we have noted herein that the state does print some of its welfare forms in Spanish, and that Los Angeles County welfare authorities make an effort to learn if a recipient is Spanish speaking only, and to assign a bilingual social worker in such cases.

Without citation of authority, plaintiffs contend that by so doing defendants have "embarked upon conduct" designed to create a "reasonable expectation" that all future communications with plaintiffs will be in the Spanish language—in other words, that defendants are somehow estopped to continue printing in English the notice here challenged. We do not agree. There is no showing that all or even a substantial portion of defendants' prior communications with plaintiffs were in fact in Spanish. In any event, we view these regulations and practices as good-faith efforts by defendants to do as much as can reasonably be done—within the limits of budget, staffing, and time—to insure that recipients who are not fluent in English are not deprived of their welfare rights solely because of their language handicap. These efforts are commendable, and we do not doubt they will continue and be expanded as it becomes feasible to do so. For the reasons stated herein, however, they are not compelled by constitutional command, and therefore do not give rise to the constitutional duty asserted by plaintiffs.

The order appealed from is affirmed.

Wright, C. J., McComb, J., Burke, J., Sullivan, J., and Clark, J., concurred.

**TOBRINER, J.,** Dissenting.—

In very recent history various cultural subgroups in our society have demanded that they be accorded a legal status not inferior to that which has long been enjoyed by the dominant element. The minorities have attacked the symbols of discrimination, and, to a large extent, and rightly, have succeeded in demolishing them. The law has reflected the social pressure for equal treatment and afforded to the subgroups a new and more meaningful legal status.[1]

One of the sensitive points of the relationship between the minority and the majority elements has been that of language. In many situations the subgroup has been imprisoned within the barrier of inability to communi-

able" to that person, the word "language" is here used as a synonym for "English." Thus construed, the regulation means only that the notice in question must be phrased in a simple vocabulary and syntax easily understood by persons of limited education.

[1]See Friedman, A History of American Law (1973) pages 576-580.

cate in the English language, and, because of that handicap has been denied fundamental rights. In this regard and in the establishment of the rights of minority groups, the decision of this court in *Castro* v. *State of California* (1970) 2 Cal.3d 223 [85 Cal.Rptr. 20, 466 P.2d 244] marks an historic and memorable step forward.

In *Castro* we posed the question before us in the following terms: "In this case we are called upon to determine whether that portion of article II, section 1 of the California Constitution which conditions the right to vote upon an ability to read the English language is constitutional as applied to persons who, in all other respects qualified to vote, are literate in Spanish but not in English." (2 Cal.3d at p. 225.) We answered the query unequivocally: ". . . we have concluded that the challenged provision, as so applied, violates the equal protection clause of the Fourteenth Amendment and is, therefore, a constitutionally impermissible exercise of the state's power to regulate the franchise." (*Id.*) Our last words in that case were: "We cannot refrain from observing that if a contrary conclusion were compelled it would indeed be ironic that petitioners, who are the heirs of a great and gracious culture, identified with the birth of California and contributing in no small measure to its growth, should be disenfranchised in their ancestral land, despite their capacity to cast an informed vote." (*Id.* at p. 243.)

In this case we deal with a more concrete and yet limited application of disqualification of members of a Spanish-speaking subgroup because of their exclusive knowledge of Spanish and corollary lack of knowledge of English. Here we do not encounter electoral disenfranchisement; we encounter, instead, disqualification from welfare benefits. The basis for that disqualification frames a narrow issue. When the administrators *know* the recipients speak Spanish only and when the administrators have *previously orally communicated* with the recipients in Spanish, can the administrators send notices of termination or reduction of benefits in *English*?

Aside from the belief by many social observers that such a practice is quite deplorable, we must weigh it in the scales of procedural due process. Procedural due process is not a matter of absolutes which permits of no distinctions between one situation and the next. Instead, in any particular case the right of the individual to procedural due process must be balanced against the legitimate interests and burdens of the state. We probe it here in light of those considerations.

In *Goldberg* v. *Kelly* (1970) 397 U.S. 254 [25 L.Ed.2d 287, 90 S.Ct. 1011] the United States Supreme Court held that recipients of public assist-

ance payments were entitled under procedural due process to an evidentiary hearing before the state may terminate those payments. Although the court did not specify the exact form and content of the termination notice in that situation it did declare that the recipient was entitled to "timely and adequate notice" of a proposed termination. (*Id.* at pp. 267-268 [25 L.Ed.2d at pp. 298-299].)[2]

We said in *Sokol* v. *Public Utilities Commission* (1966) 65 Cal.2d 247, 254 [53 Cal.Rptr. 673, 418 P.2d 265] "What is due process depends on circumstances. It varies with the subject matter and the necessities of the situation. (Holmes, J., in *Moyer* v. *Peabody* (1909) 212 U.S. 78, 84 . . . .) Its content is a function of many variables, including the nature of the right affected, the degree of danger caused by the proscribed condition or activity, and the availability of prompt remedial measures."

I have pointed out on another occasion[3] that a "cornerstone of the structure of due process of law is that the adjudication of a significant right must be 'preceded by notice and opportunity for hearing appropriate to the nature of the case.' (*Mullane* v. *Central Hanover Bank & Tr. Co.* (1950) 339 U.S. 306, 313 [94 L.Ed. 865, 873, 70 S.Ct. 652].) Accordingly, the courts have held that due process affords to the affected individual a right to timely and adequate notice in criminal proceedings [citations], in civil proceedings [citations], in juvenile proceedings [citation] and in administrative proceedings [citations]. [¶] The United States Supreme Court 'has consistently made plain that adequate and timely notice is the fulcrum of due process whatever the purposes of the proceeding. [Citations.] Notice is ordinarily the prerequisite to effective assertion of any constitutional or other rights; without it, vindication of those rights must be essentially fortuitous. So fundamental a protection can neither be spared here nor left to the "favor or grace" of state authorities. . . .' [Citations.] In order to be constitutionally adequate and timely, notice must be 'reasonably

---

[2]The *Goldberg* court did not deal with the issue of whether welfare termination notices to Spanish-speaking recipients must be in that language; indeed, there is no indication that the question was before the court at all. The court did state, however, that the particular means of notice employed by the City of New York—a personal conference with a caseworker followed by a letter from a unit supervisor—were constitutionally adequate. (*Id.* at p. 268 [25 L.Ed.2d at p. 299].) Although at least 2 of the 20 named plaintiffs in that case had Spanish surnames (*id.* at p. 256, fn. 2 [25 L.Ed.2d at pp. 292-293]), the opinion does not reveal if any of the plaintiffs were literate only in Spanish. We cannot determine from the opinion whether the City of New York employed caseworkers fluent in Spanish to work with Spanish-speaking recipients or whether the city sent termination notices in Spanish to recipients it knew to be literate only in that language.

[3]*In re Tucker* (1971) 5 Cal.3d 171, 196 [95 Cal.Rptr. 761, 486 P.2d 657] (Tobriner, J.. concurring and dissenting).

calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.' (*Mullane* v. *Central Hanover Bank & Tr. Co., supra,* 339 U.S. 306, 314 [94 L.Ed. 865, 873]; . . .)"

In *Mullane* the Supreme Court further specified as to notice: "The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected [citations], or, where conditions do not reasonably permit such notice, that the form chosen is not substantially less likely to bring home notice than other of the feasible and customary substitutes." (*Mullane* v. *Central Hanover Tr. Co.* (1950) 339 U.S. 306, 315 [94 L.Ed. 865, 873-874, 70 S.Ct. 652].)

We submit, then, in sum, that procedural due process is not composed of weights of absolute quantities in the judicial scales but rather of relative counters in those scales; the issue turns on the relative importance of adequote notice to the welfare recipient and the corresponding burden to the departments in printing the notice in Spanish. We have pointed out that notice is the very essence of due process.

We need not labor the importance of the deprivation of notice to the recipient or the life and death aspect of welfare relief. As to the burden to the departments, the majority opinion is most helpful; the majority admit: "the state *does* print some of its welfare forms in Spanish." (Opn. *ante,* at p. 817.) (Italics added.) If some "forms" are *now* printed in Spanish it cannot be unduly burdensome to print the form of revocation or reduction in Spanish, particularly when the departments are expected to mail the forms only to those whom the departments *know* speak Spanish exclusively and to whom the departments have *previously communicated* orally in Spanish and to whom the departments recognize the importance of so doing.[4]

Since defendant departments have already seen fit to identify Spanish-speaking recipients who are illiterate in English, to assign caseworkers fluent in Spanish to those recipients, and to furnish welfare forms in Spanish, the burden on defendants of printing a single additional form in Spanish—the notice of reduction or termination of benefits—would certainly be minimal. Indeed, every apologetic assertion as to that which the departments now do to communicate in Spanish is an argument that it is no great burden to do that which the Constitution requires. We there-

---

[4]See majority opinion, *ante,* page 816, footnote 10.

fore conclude that defendants' present method of notifying AFDC recipients known by defendants to be illiterate in English but literate in Spanish is unconstitutional under the Fourteenth Amendment.

Despite the fact that the departments would be exposed to so slight a burden by sending notices in Spanish but that the recipients would be subjected to so crucial a loss, and despite the fact the scales of procedural due process tip so heavily in favor of plaintiffs, defendants proffer two hypotheses of defense. First, they say it may be reasonably assumed that in any event, the recipient will get the notice translated. Second, an acceptance of plaintiffs' position would lead to a requirement that notices in *all* assistance programs be printed in *all* foreign languages!

As to the first defense, the majority conclude that "the government may reasonably assume that the non-English speaking individual will act promptly to obtain such assistance (in translation) when he receives the notice in question." (Opn. *ante,* at p. 813.) To postulate a "reasonable assumption" that recipients of the notice may seek out a translator is a far cry from finding that the notices *are* "reasonably certain to inform" a Spanish-speaking recipient of the reasons for the reduction or termination of his benefits and of his right to a hearing. (See *Mullane* v. *Central Hanover Tr. Co.* (1950) *supra,* 339 U.S. 306, 315.)

Two cogent reasons demonstrate why the method of notice employed here is not reasonably certain to inform persons illiterate in English. In the first place, the unwary recipient may not appreciate the need for a translation. Unlike the situation in *Goldberg* v. *Kelly* (1970) 397 U.S. 254 [25 L.Ed.2d 287, 90 S.Ct. 1011], plaintiffs may not have had the benefit of a prior personal conference with a caseworker to inform them that reduction or termination of their benefits is in the offing. Moreover, since plaintiffs' personal dealings with defendants have been at least in part through Spanish-speaking caseworkers, and since defendants do print other welfare forms in Spanish, plaintiffs may have been led to believe the notice was simply not important enough to warrant an immediate translation.

Secondly, the recipient may be unable to obtain a translation at all; if he does obtain one, it may be too late to request a hearing within the prescribed 15-day persiod. The recipient may not be able to afford to pay for the services of translation. Even when free translation services are available, the recipient may lack the time or the transportation necessary to obtain them. In short, placing the burden on the *recipient* to obtain a translation of the notice employed by defendants is not reasonably calculated to apprise him of his right to request a hearing.

As to the second defense, the majority describe a *concursus horribilium* (*People* v. *Crow* (1973) 8 Cal.3d 815, 835 [106 Cal.Rptr. 369, 506 P.2d 193] (Mosk, J., dissenting)), which they insist will attend our approval of plaintiffs' plea. According to the majority, the decision could not be limited to the AFDC program and the Spanish language, but would also apply to all categorical assistance programs and to all foreign languages. Next, the ruling would be extended to all official communications required to satisfy due process. Moreover, and the ultimate horror, the state would be required to conduct all its affairs in every language which is spoken by any person under its jurisdiction. Government would then grind to a halt, disabled by the need to perfectly inform its citizens.

The parade of horrors here, as so often, is no more than a retreat into the irrational. Surely we do not suggest that defendants would necessarily be required to furnish notices in Basque or Chippewa. We have explained in some detail that the application of procedural due process involves the weighing of the state's burden against the individual's benefit; in view of the fact that a *significant number* of California residents speak and read only Spanish and that defendants recognize this fact, since they have taken the commendable steps of providing Spanish-speaking caseworkers and of printing some forms in Spanish, the burden of printing the challenged forms in Spanish would be comparatively light.

Whether the expense and inconvenience of printing forms in other languages of the notices of reduction or termination of benefits would be justifiable must be decided in each case on the basis of the relevant facts. The state knows which AFDC recipients read only Spanish; the state deals with a sufficient number of Spanish-speaking persons to justify the conclusion that printing notices in Spanish does not compose a special burden. Applying the same practical analysis the state need not print notices in Basque or Chippewa because it does not know which recipients, if any, speak only those languages, and because there are so few of such recipients that the expense of translating and printing the notice would be unreasonable.

We conclude that individuals situated as the plaintiffs before us are constitutionally entitled to notice in Spanish before their welfare payments may be reduced or terminated because the due process protections afforded by such notice are significant while the burden upon the state in providing them is minimal. We reject the implication that such a holding would necessarily extend to other language groups or to all other government communications. Under a different set of circumstances, the balance of

interests between individual and state may be entirely different and may accordingly dictate a different result.

We subscribe to the majority's allusion to the enrichment of our cosmopolitan society by the immigration "of persons from many lands with their distinctive linguistic and cultural heritages." (Opn. *ante,* at p. 816.) We would insist that those of that group who receive Aid to Families with Dependent Children are entitled to procedural due process as to reduction or termination of welfare benefits, notices which entail a relatively slight burden to the state, but which are crucial to the recipients.

In the long effort of the subgroups in our culture to attain recognition and participation the majority opinion can only be an unfortunate step backwards.

I would reverse the judgment.