Anibal SOBERAL–PEREZ, on behalf of himself and all others similarly situated, Plaintiff-Appellant,

Benito Cortez, Intervenor-Appellant,

v.

Margaret M. HECKLER, Secretary of Health and Human Services, Defendant-Appellee.

No. 1243, Docket 82–6340.

United States Court of Appeals, Second Circuit.

Argued April 27, 1983.

Decided Aug. 30, 1983.

Arthur J. Fried, New York City (Kalman Finkel, Attorney-in-Charge, The Legal Aid Society, Civil Division, New York City, Joan Mangones, Attorney-in-Charge, Staten Island Neighborhood Office, Staten Island, N.Y., Kathleen A. Masters, New York City, of counsel), for plaintiff-appellant and intervenor-appellant.

Robert L. Begleiter, New York City, Asst. U.S. Atty., E.D.N.Y., Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty., E.D.N.Y., Miles M. Tepper, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for defendant-appellee.

Jack John Olivero, New York City (Puerto Rican Legal Defense & Education Fund, Inc., New York City, Robert L. Becker, New York City, of counsel), for amicus curiae.

Before LUMBARD, NEWMAN and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

We are faced on this appeal with the question of whether the defendant Secretary's failure to provide written notices and oral instructions, information, and advice in the Spanish language violates the statutory protection against discrimination found in § 601 et seq. of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., or plaintiffs' constitutional rights to due process and equal protection of the law. Plaintiffs and plaintiff-intervenors, (hereinafter "plaintiffs") are Hispanics with limited abilities in the English language. Their initial claims for social security and/or supplemental security income (hereinafter "social security") benefits were denied allegedly because of the Secretary's failure to provide notices and oral instructions in Spanish. The district court found that plaintiffs had failed to state either a statutory or constitutional claim and granted the Secretary's motion to dismiss the complaint. *Soberal-Perez v. Schweiker,* 549 F.Supp. 1164 (E.D. N.Y.1982). We affirm.

Each plaintiff's dominant language is Spanish, and each has at most a limited ability to speak and understand English. Plaintiffs Soberal-Perez, Cortez, and Carballo each applied for disability benefits pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401–431 (1976 & Supp. V 1981), or supplemental security income benefits pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383c (1976 & Supp. V 1981), or both. All received notices of denial of their claims in English, and, allegedly because of their inability to understand these notices and the oral instructions given at the social security office, all waived a right to a hearing or failed to file timely appeals.

Plaintiff De La Cruz, a recipient of benefits under Title XVI, was advised by social security personnel to return to work for a sufficient number of quarters to qualify for retirement benefits, but after he had done so was informed that his earnings had not been properly included in the computation of his benefits and that the overpayment would be recovered from future checks. He requested a waiver on the ground that he did not understand the reporting requirements but, after a hearing at which plaintiff was represented by counsel and a translator was present, this request was denied.

After commencement of this lawsuit, all claims but that of De La Cruz were remanded to the Secretary for full evidentiary hearings. Plaintiffs Cortez and Carballo have been awarded benefits. Soberal-Perez lost on the merits and, when the district court affirmed in a separate decision, he did not appeal.

Plaintiffs allege that the Secretary's failure to print notices and forms in Spanish and to provide oral instructions in Spanish at the social security office violated their due process and equal protection rights as well as their rights under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

They seek a judgment declaring that the Secretary's actions violate their constitutional and statutory rights and an injunction requiring the Secretary to provide documents and oral services in the Spanish language to persons in plaintiffs' position. An examination of plaintiffs' claims convinces us that the district court was correct in dismissing the complaint.

*Title VI Claims.*

█ Section 601 of Title VI of the Civil Rights Act of 1964 provides:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d (1976). Plaintiffs challenge the district court's conclusion that Title VI does not apply to direct benefit programs such as Titles II and XVI of the Social Security Act. The district court read the language of Title VI, 42 U.S.C. § 2000d–1 (1976), which empowers federal agencies to cut off funds for noncompliance with the statute, as well as the legislative history of the 1964 Civil Rights Act, to support the view that Title VI does not apply to the social security programs at issue here because they are directly administered by the federal government rather than through a state or local intermediary. Plaintiffs argue that the legislative history and the case law recognizing a private right of action under Title VI, *see Cannon v. University of Chicago,* 441 U.S. 677, 696 and n. 21, 99 S.Ct. 1946, 1957 and n. 21, 60 L.Ed.2d 560 (1980) (citing cases), mandate a contrary result.

As the district court noted, the language of § 601 does not definitively exclude programs receiving direct funding through federal legislation since, strictly speaking, they are "program[s] or activit[ies] receiving Federal financial assistance." However, § 602 of Title VI, 42 U.S.C. § 2000d–1, which was hotly debated prior to its passage, grants a rulemaking power to "[e]ach Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract". 42 U.S.C. § 2000d–1. Compliance with any requirement issued pursuant to this rulemaking authorization "may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient * * * or (2) by any other means authorized by law". *Id.* This compliance mechanism does not reach programs under Titles II and XVI of the Social Security Act because they do not receive financial assistance through "grant, loan, or contract". As viewed by the district court, if Congress had intended Title VI to apply to direct benefit programs, it would have developed a method to enforce compliance applicable to those programs. *Soberal-Perez v. Schweiker,* 549 F.Supp. at 1172.

█ While we agree with the district court that the language of § 602 gives some indication that Congress did not intend direct benefit programs to fall within the ambit of Title VI, we find further support for this conclusion in the regulations promulgated by the Secretary and the legislative history of the statute. In addition, although we have found only one case directly on point, *Bob Jones University v. Johnson,* 396 F.Supp. 597 (D.S.C.1974) (cash payments made directly by federal government not covered by Title VI), *aff'd mem.,* 529 F.2d 514 (4th Cir.1975), the conclusion we draw from the case law interpreting Title VI is that the statute was meant to cover only those situations where federal funding is given to a non-federal entity which, in turn, provides financial assistance to the ultimate beneficiary.

Section 602 provides that any "recipient" found in noncompliance with Title VI may be subject to a termination of funds to the program or activity receiving federal financial assistance. The regulations promulgated by the Secretary under Title VI define a "recipient" as

> any State, political subdivision of any State, or instrumentality of any State or political subdivision, any public or private agency, institution, or organization, or

other entity, or any individual, in any State, to whom Federal financial assistance is extended, directly or through another recipient, for any program, including any successor, assign, or transferee thereof, but such term does not include any ultimate beneficiary under any such program.

45 C.F.R. § 80.13(i) (1982). This definition does not include federal agencies which directly administer programs such as Titles II and XVI of the Social Security Act. Thus, the Secretary's own interpretation of the statute excludes federal agencies from the scope of her enforcement powers. While we do not consider the Secretary's interpretation the last word on the subject, the fact that, in promulgating regulations to facilitate compliance with Title VI, the Secretary, as well as the heads of other administrative agencies, *see, e.g.,* 24 C.F.R. § 1.2(f) (1982) (Department of Housing and Urban Development); 28 C.F.R. § 42.102(f) (1982) (Department of Justice), has excluded direct benefit programs from the definition of those whose funds may be cut off for noncompliance with Title VI, is entitled to some consideration. *See NLRB v. Bell Aerospace,* 416 U.S. 267, 274–75, 94 S.Ct. 1757, 1761–62, 40 L.Ed.2d 134 (1974); *Trafficante v. Metropolitan Life Insurance Co.,* 409 U.S. 205, 210, 93 S.Ct. 364, 367, 34 L.Ed.2d 415 (1972); *United States v. Bergh,* 352 U.S. 40, 46–47, 77 S.Ct. 106, 109–10, 1 L.Ed.2d 102 (1956).

We need not rest our conclusion that Title VI is not applicable to direct benefit programs on the language of the statute and the Secretary's interpretation alone. The lengthy congressional debates prior to the passage of the Civil Rights Act of 1964 strongly indicate that, in enacting Title VI, Congress was in part addressing its concern that federal moneys not be used to finance racially segregated state, local, and private programs. *See Cannon v. University of Chicago,* 441 U.S. at 704, 99 S.Ct. at 1961; *Regents of the University of California v. Bakke,* 438 U.S. 265, 285 and n. 19, 98 S.Ct. 2733, 2745 and n. 19, 57 L.Ed.2d 750 (1978).

The Congressional Record is replete with statements by representatives and senators indicating that the legislation was intended to cover situations where the federal government extends assistance to a state or local program or activity which in turn distributes it to beneficiaries of the program. For example, Senator Kuchel, speaking in support of Title VI, said, "No recipient is required to accept Federal aid. If a State or municipality or other local government agency does so, it does so voluntarily. It ought not to receive it if it is dedicated to use it in an unconstitutional manner." 110 Cong.Rec. 6562 (1964). Emphasis in Congress was placed on the fact that the proposed legislation applied to programs involving financial assistance by "grant, loan, or contract." *E.g., id.* at 6543 (remarks of Senator Humphrey); *id.* at 6561 (remarks of Senator Kuchel); *id.* at 2464 (remarks of Congressman Poff). And Senator Keating, defending the proposed legislation against its very vocal opponents, stated that "[g]enerally, a recipient will be a State or political subdivision" but that the statute "could [also] involve Federal assistance to private organizations." *Id.* at 9111. The overall impression we draw from these statements is that congress intended Title VI to apply to programs or activities involving three parties: a federal agency, a state or local intermediary administering the program, and an ultimate beneficiary.

Furthermore, some statements made during the congressional debates on Title VI appear to exclude expressly direct benefit programs such as Titles II and XVI of the Social Security Act from Title VI coverage. Senator Humphrey's statement that "title VI will have no practical effect on [social security] programs" in part because the federal government cannot engage in racial discrimination, *id.* at 6544–45, supports the argument that proponents of the legislation apparently believed that the Constitution and the Social Security Act itself provided sufficient protection against discrimination in direct benefit programs. *See Soberal-Perez v. Schweiker,* 549 F.Supp. at 1172.

In response to charges that a person's social security benefits might be terminated

if he or she engaged in discrimination, Senator Ribicoff stated:

> The bill has to do with Federal assistance. Social security is a direct-payment program. It is a direct payment received by the individual. The individual who receives a direct payment has a right. It has nothing to do with Federal assistance. It is not Federal assistance to an individual, but a direct payment. *Direct payments are not covered in any way by Title VI.*

110 Cong.Rec. 8424 (1964) (emphasis supplied). Later in the same debate, Senator Ribicoff continued this theme:

> [E]very proponent of the measure who has stood on the floor of the Senate has time and time again said that social security payments would not be covered by the measure. That is the legislative history which has been made on the bill.

*Id.* at 8426. And shortly thereafter, he said

> Since the social security payment to an individual is not a part of a program or activity covered by title VI in the first place, it need not be specifically exempted. *Id.*

Senator Keating also indicated that Title VI had no applicability to direct benefit programs: "Only where an intervening State or local governmental agency exists could the misapplication of assistance even potentially occur." *Id.* at 9113.

Finally, Deputy Attorney General Katzenbach of the Justice Department, in response to a request from Congressman Celler for a list of programs and activities within the scope of Title VI, stated:

> [D]isability benefits under title II of the Social Security Act might be considered to involve financial assistance by way of grant. But to the extent that there is financial assistance in either type of program, the assistance is to an individual and not to a "program or activity" as required by title VI. In any event, title VI would not substantially affect such benefits, since these payments are presently made on a nondiscriminatory basis, and since discrimination in connection with them is precluded by the fifth

amendment to the Constitution * * *. Accordingly, such programs are omitted from the list [of programs covered by Title VI].

109 Cong.Rec. 13380 (1963).

We are aware that many of these statements were made in response to charges by the bill's opponents that individual recipients of direct federal benefits might have their payments terminated if they were found to discriminate in some way. Nevertheless, the clear import of the congressional debates is that Congress did not intend the direct benefit programs of social security to be within the scope of Title VI. It was not thought to be necessary because the fifth amendment and the Social Security Act itself prohibited discrimination in the payment of benefits.

Finally, the analysis employed in cases addressing other issues under Title VI also lends support to the conclusion that direct benefit programs are not covered. In *Regents of the University of California v. Bakke, supra,* Justice Brennan stated that the legislative history of Title VI "reveals one fixed purpose: to give the Executive Branch of Government clear authority to terminate federal funding of private programs that use race as a means of disadvantaging minorities in a manner that would be prohibited by the Constitution if engaged in by government." 438 U.S. at 329, 98 S.Ct. at 2768. (Brennan, J., concurring in part and dissenting in part). And Justice Marshall's dissent in *Guardians Association v. Civil Service Commission of the City of New York,* —— U.S. ——, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), reinforces the conclusion that Title VI covers programs or activities involving indirect payments to beneficiaries:

> In exchange for federal moneys, recipients have promised not to discriminate. Because Title VI is intended to ensure that "no person" is subject to discrimination in federally assisted programs, private parties function as third-party beneficiaries to these contracts.

*Id.* at ——, 103 S.Ct. at 3248. *See Lau v. Nichols,* 414 U.S. 563, 571 n. 2, 94 S.Ct. 786,

790 n. 2, 39 L.Ed.2d 1 (1974) (Stewart, J., concurring). This emphasis upon the contractual nature of the receipt of federal moneys in exchange for a promise not to discriminate is still another reason to conclude that Title VI does not cover direct benefit programs since these programs do not entail any such contractual relationship.

Our conclusion, based on our examination of the statute itself, its legislative history, and the inferences which can be drawn from the case law, is that Title VI was not intended to apply to Titles II and XVI of the Social Security Act. Accordingly, the district court was correct in dismissing plaintiff's statutory claims, and we need not reach the apparently still unsettled question of whether Title VI requires a showing of intentional discrimination. *Compare Guardians Association v. Civil Service Commission of the City of New York,* ⸺ U.S. ⸺, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), *and Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), *with Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974). Nor need we consider the proposition, supported by at least four members of the Court, that non-discrimination regulations promulgated under Title VI may be found violated upon a showing only of disparate impact, *Guardians Association, supra,* ⸺ U.S. at ⸺ n. 2, 103 S.Ct. at 3223 n. 2 (White, J., announcing judgment of the Court); *id.* at ⸺, 103 S.Ct. at 3249–3251 (Stevens, J. with whom Brennan and Blackmun, JJ., join, dissenting), since the regulations on which plaintiffs rely, 45 C.F.R. Part 80 (1982), like Title VI itself, do not apply to direct benefit programs, *id.* §§ 80.1, .2, .13(f), (g), and (i).

*Equal Protection Claims.*

■ Plaintiffs' first constitutional claim is that the Secretary's failure to provide forms and services in Spanish discriminates against Hispanics on the basis of national origin and thus violates their right to equal protection of the law incorporated into the fifth amendment by the due process clause, *see Hampton v. Wong,* 426 U.S. 88, 100, 96 S.Ct. 1895, 1903–04, 48 L.Ed.2d 495 (1976);

*Bolling v. Sharpe,* 347 U.S. 497, 500, 74 S.Ct. 693, 694–95, 98 L.Ed. 884 (1954). The district court dismissed this claim for failure to allege a violation of equal protection principles. We agree.

■ Where governmental action disadvantages a suspect class or burdens a fundamental right, the conduct must be strictly scrutinized and will be upheld only if the government can establish a compelling justification for the action. *See, e.g., Regents of the University of California v. Bakke,* 438 U.S. at 299–300, 98 S.Ct. at 2752–2753; *San Antonio School District v. Rodriguez,* 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973). Where a suspect class or a fundamental right is not implicated, the challenged action need only be rationally related to a legitimate governmental purpose. *See Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976). While entitlement to social security benefits is not a fundamental right, *Weinberger v. Salfi,* 422 U.S. 749, 771–72, 95 S.Ct. 2457, 2469–70, 45 L.Ed.2d 522 (1975), Hispanics as an ethnic group do constitute a suspect class for the purpose of equal protection analysis, *Keyes v. School District No. 1,* 413 U.S. 189, 197, 93 S.Ct. 2686, 2691–92, 37 L.Ed.2d 548 (1973); *Hernandez v. Texas,* 347 U.S. 475, 477–79, 74 S.Ct. 667, 669–71, 98 L.Ed. 866 (1954). Nevertheless, the conduct at issue here, the Secretary's failure to provide forms and services in the Spanish language, does not on its face make any classification with respect to Hispanics as an ethnic group. A classification is implicitly made, but it is on the basis of language, *i.e.,* English-speaking versus non-English-speaking individuals, and not on the basis of race, religion or national origin. Language, by itself, does not identify members of a suspect class. *Frontera v. Sindell,* 522 F.2d 1215, 1219–20 (6th Cir.1975); *Carmona v. Sheffield,* 475 F.2d 738, 739 (9th Cir.1973).

■ Plaintiffs' claim is that the Secretary's conduct, although neutral on its face, nevertheless discriminates against Hispanics who are unable to speak or understand English. It is true that facially neutral

conduct can constitute discrimination in violation of the Equal Protection Clause; however, such a claim requires that a plaintiff show an intent to discriminate against the suspect class. *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 265–70, 97 S.Ct. 555, 563–66, 50 L.Ed.2d 450 (1977); *Washington v. Davis*, 426 U.S. 229, 240–42, 96 S.Ct. 2040, 2047–49, 48 L.Ed.2d 597 (1976); *see Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979). Plaintiffs have not alleged the requisite intent. The complaint states that the Secretary's failure to provide Spanish language services reflects a preference for English-speaking people over Hispanics. However, as we noted above, the Secretary's action reflects, at most, a preference for English over all other languages.

Plaintiffs argue that intent to discriminate against Hispanics may be inferred because "the natural, probable and foreseeable result" of the Secretary's action is a disproportionate impact upon Hispanics. " 'Discriminatory purpose', however, implies more than intent as volition or intent as awareness of consequences." *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. at 279, 99 S.Ct. at 2296. To establish intentional discrimination, a plaintiff must show that "the decisionmaker * * * selected or reaffirmed a particular course of action at least in part 'because of' not merely 'in spite of' its adverse effects upon an identifiable group." *Id.* (footnote omitted). While it is true, as plaintiffs argue, that the fact that a particular action has a foreseeable adverse impact may be relevant evidence in proving an equal protection claim, *Dayton Board of Education v. Brinkman*, 443 U.S. 526, 536 n. 9, 99 S.Ct. 2971, 2978 n. 9, 61 L.Ed.2d 720 (1979); *Lora v. Board of Education of the City of New York*, 623 F.2d 248, 250 (2d Cir.1980), standing alone that fact is insufficient to establish discriminatory intent, *id.* And plaintiffs have failed to show either in their complaint or their memorandum or at oral argument that they can allege in good faith, much less prove, any other evidence of discriminatory intent.

This is a case where "the legitimate non-invidious purposes of a law cannot be missed." *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. at 275, 99 S.Ct. at 2294. It is not difficult for us to understand why the Secretary decided that forms should be printed and oral instructions given in the English language: English is the national language of the United States.

■ Ironically, plaintiffs' argument that the use of Spanish is mandated only because of the size of our nation's non-English-speaking Hispanic population, in itself suggests a violation of equal protection principles. A suspect class does not merit constitutional protection against discrimination merely because it has reached "major" proportions. A decision to provide Spanish language services as well as English would merely shift the alleged discrimination to all other non-English-speaking groups. *See Frontera v. Sindell*, 522 F.2d at 1219.

Since we have determined that the Secretary's action does not discriminate against Hispanics as a group, our inquiry must focus on whether the action bears a rational relationship to a legitimate governmental purpose. *See, e.g., Clements v. Fashing*, 457 U.S. 957, 968, 102 S.Ct. 2836, 2846, 73 L.Ed.2d 508 (1982); *Massachusetts Board of Retirement v. Murgia*, 427 U.S. at 314, 96 S.Ct. at 2567. We need only glance at the role of English in our national affairs to conclude that the Secretary's actions are not irrational. Congress conducts its affairs in English, the executive and judicial branches of government do likewise. In addition, those who wish to become naturalized United States citizens must learn to read English. 8 U.S.C. § 1423 (1976 & Supp. II 1978). (Because they were born in Puerto Rico, plaintiffs Soberal-Perez, Cortez, and Carballo are citizens of the United States, 8 U.S.C. § 1402 (1976), and need not establish any fluency in English, *Arroyo v. Tucker*, 372 F.Supp. 764, 766 (E.D.Pa.1974)). Given these factors, it is not irrational for the Secretary to choose English as the one language in which to conduct her official

affairs. *See Frontera v. Sindell,* 522 F.2d at 1219; *Carmona v. Sheffield,* 325 F.Supp. 1341, 1342 (N.D.Cal.1971), *aff'd,* 475 F.2d 738 (9th Cir.1973).

*Due Process Claims.*

Plaintiffs' final claim is that they were denied the adequate notice and meaningful opportunity to be heard guaranteed by the due process clause. *Mathews v. Eldridge,* 424 U.S. 319, 348, 96 S.Ct. 893, 909, 47 L.Ed.2d 18 (1976); *Armstrong v. Manzo,* 380 U.S. 545, 550, 85 S.Ct. 1187, 1190–91, 14 L.Ed.2d 62 (1965). Because plaintiffs did not specifically argue this claim before the district court, the district judge concluded that it had been abandoned; nevertheless, he considered the claim on its merits *Sober-al-Perez v. Schweiker,* 549 F.Supp. at 1166 n. 2, and so shall we.

Plaintiffs' interest in the receipt of social security benefits is protected by the due process clause of the fifth amendment. *Mathews v. Eldridge,* 424 U.S. at 332, 96 S.Ct. at 901. The question before us is what process is due. *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). While the fundamental tenets of due process require adequate notice to ensure that all parties have a meaningful opportunity to be heard, *Armstrong v. Manzo,* 380 U.S. at 552, 85 S.Ct. at 1191, due process "is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 17, 43, 1748–49, 6 L.Ed.2d 1230 (1961). Rather, it calls for procedures fitted to the circumstances of particular situations. *Goss v. Lopez,* 419 U.S. 565, 578, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975); *Morrissey v. Brewer,* 408 U.S. at 481, 92 S.Ct. at 2600. The basic standard to be applied is one of reasonableness. "The notice must be of such nature as reasonably to convey the required information * * * and it must afford a reasonable time for those interested to make their appearance". *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950).

Plaintiffs argue that notice in English to those with limited English abilities is a "mere gesture [which] is not due process," *id.* at 315, 70 S.Ct. at 657. We do not agree. Notice in the English language to social security claimants residing in the United States is "reasonably calculated" to apprise individuals of the proceedings.

In considering a similar claim, the Supreme Judicial Court of Massachusetts noted that " '[n]otice of facts which would incite a person of reasonable prudence to an inquiry under similar circumstances is notice of all the facts which a reasonably diligent inquiry would develop.' " *Commonwealth v. Olivo,* 369 Mass. 62, 69, 337 N.E.2d 904, 909 (1975) (quoting *Essex National Bank v. Hurley,* 16 F.2d 427, 428 (1st Cir.1926)). At issue in *Olivo* were official notices to vacate unsafe housing written in English and personally served on Spanish-speaking individuals who could not understand English. *Id.* 369 Mass. at 69, 337 N.E.2d at 906. Finding that this service constituted actual notice of the proceedings, the court held that it was "sufficient to put a reasonable person on notice that the order was important and, if not understood, required translation." *Id.* at 70, 337 N.E.2d at 909. Thus, when served with an official notice in English, the tenants, who were under no impairment other than their inability to understand English, were there charged with the duty of further inquiry. *Accord Tahan v. Hodgson,* 662 F.2d 862, 865 (D.C.Cir.1981) (English-speaking person served in Israel with papers written in Hebrew had duty to inquire further); *Guerrero v. Carleson,* 9 Cal.3d 808, 813, 512 P.2d 833, 836, 109 Cal.Rptr. 201, 204 (1973) (In bank), *cert. denied,* 414 U.S. 1137, 94 S.Ct. 883, 38 L.Ed.2d 762 (1974).

No plaintiff in this litigation alleges that he is under a disability which would prevent him from understanding the need for further inquiry. Plaintiffs' only non-physical disability is that they are unable to understand English. A rule placing the burden of diligence and further inquiry on the part of a non-English-speaking individual served in this country with a notice in English does not violate any principle of due process.

**44**

Having determined that due process does not in general require the Secretary to provide notices and initial services in Spanish, we need not tarry long on the specific due process claims of these plaintiffs. Each plaintiff whose claim is before us (De La Cruz's individual claim concerning overpayment of benefits is still before the district court, *Soberal-Perez v. Schweiker,* 549 F.Supp. at 1176) received a full evidentiary hearing with a translator and counsel present. Two were awarded benefits; the third was denied benefits on the merits of his disability claim. All have been accorded a reasonable opportunity to be heard. Considering the "time, place and circumstances" surrounding these claims, *Mathews v. Eldridge,* 424 U.S. at 334, 96 S.Ct. at 902, we conclude that these plaintiffs received the process due them. Whether due process would ever, under any circumstances, mandate particular documents or particular services in a language other than English is a question not before us.

Accordingly, the judgment of the district court denying class certification and dismissing the complaint is affirmed.