522 F.2d 1215
 11 Fair Empl.Prac.Cas. 1132,
10 Empl. Prac. Dec. P 10,375
Damian FRONTERA on his own behalf and on behalf of all
others similarly situated, Plaintiff-Appellant,
v.
David I. SINDELL et al., Defendants-Appellees.
 No. 75-1038.
 United States Court of Appeals,
Sixth Circuit.
 Aug. 25, 1975.
 
 Kenneth Montlack, Cleveland, Ohio, for plaintiff-appellant.
 William J. Brown, Atty. Gen., Andrew J. Ruzicho, Gene W. Holliker, Asst. Attys. Gen., Civ. Rights Section, Columbus, Ohio, for amicus curiae Ohio Civil Rights Commission.
 James B. Davis, Robert W. Jones, Cleveland, Ohio, for defendants-appellees.
 William Louis Tabac, Gary T. Kelder, Cleveland State University, Cleveland-Marshall College of Law, Cleveland, Ohio, for amicus curiae American Civil Liberties Union/Cleveland Chapter.
 Before PHILLIPS, Chief Judge, and WEICK and ENGEL, Circuit Judges.
 WEICK, Circuit Judge.
 
 
 1
 Plaintiff, Frontera, instituted a class action in the District Court in behalf of himself and all Spanish speaking persons, including persons of Puerto Rican and Spanish-American ancestry, against the Civil Service Commission of the City of Cleveland and the Commissioner of Airports.
 
 
 2
 Frontera alleged in his complaint that he had been employed as a carpenter at the Cleveland Hopkins Airport under temporary appointment, and that he applied for and took the examination for carpenter permanent appointment, which examination was conducted by the Commission.
 
 
 3
 Frontera failed to pass the examination and was not certified for the appointment. He claimed that he failed because the examination was conducted in the English language and not in Spanish, and that he did not understand some of the language. In his complaint he sought an injunction to restrain the Commission
 
 
 4
 . . . from maintaining a policy, practice, custom or usage of discrimination against plaintiff and other Spanish-speaking persons in his class because of national and ethnic origin and ancestry by (a) refusing to provide pre-examination announcements and literature in the Spanish language; (b) refusing to administer examination instructions in the Spanish language; (c) refusing to provide the written Civil Service examinations for positions in the City of Cleveland in the Spanish language; and (d) refusing to provide retesting with appropriate safeguards, including the use of Spanish instructions and test material, for Plaintiff and other Spanish-speaking persons denied equal opportunities and protection under the law. (A. 7)
 
 
 5
 Frontera alleged that his Fourteenth Amendment rights and civil rights under 42 U.S.C. §§ 1981, 1983 and 1985 had been violated and he prayed for damages in addition to injunctive relief.
 
 
 6
 The case was tried before the District Court on the evidence and arguments of counsel. The Court determined that the case was a proper class action. The Court, in a written opinion in which it adopted findings of fact and conclusions of law, upheld the right of the Commission to conduct the examinations in English. Frontera appealed. We affirm.
 
 
 7
 Frontera was born in Puerto Rico and educated there through the fourth grade. He moved from Puerto Rico to Cleveland in 1953 at the age of 28. Frontera speaks English poorly and can read basic English only with great difficulty. He is a member of the Carpenter's Union local, having been admitted to the Union on the basis of an oral test and an inspection of his carpentry work.
 
 
 8
 Counsel stipulated that Frontera has substantial skill as a carpenter. He was a good "handyman."
 
 
 9
 The position of carpenter permanent appointment for which he applied was one of the highest paid positions in the City of Cleveland. Craftsmen are paid at rates which sometimes exceed that of Commissioners in the various divisions.
 
 
 10
 Frontera competently performed his job at the airport under the temporary appointment. Frontera's problem with the English language did not interfere with communication between his supervisor and him, nor did it interfere with the performance of the work assigned him. Carpenters at the airport did not work from blueprints, but rather worked from verbal instructions, sketches and work orders. He generally understood his supervisor's instructions and would ask questions if they were necessary to clarify his instructions, and he had no difficulty with the sketches.
 
 
 11
 The Civil Service Commission announced an examination for the skilled crafts on April 13, 1970.[1] Frontera applied to take the carpenters' examination. The examination was scheduled for May 20, 1970. Frontera contacted several people in an effort to have the test administered to him in Spanish. He was informed that he would be able to take the test in Spanish and on May 18, 1970 the Commission formally voted to have the test translated if possible. However, due to a lack of both time and a trade dictionary for translating the technical terms in the carpentry test, the Civil Service employee who had been given the assignment of translating the test was unable to do so. Therefore, the test was administered only in English.
 
 
 12
 Frontera did examine some text books which his daughter and wife obtained for him at the Municipal Reference Library but he testified that he did not understand the books. He asked no one to help him prepare for the examination.
 
 
 13
 The test consisted of a performance section in which the applicants constructed a wooden frame and a written section in which the applicants were asked questions dealing with carpentry. An applicant could score 50 points on each section of the test. A minimum score of 70 points was required to pass the test. Frontera failed the test, scoring 36 points on the performance section and 31.349 points on the written section. He ranked 103rd of the 127 applicants. Concerning the performance section of the test, Frontera testified that he did not understand that he was allowed to use clamps to help construct the frame which clamps were on the work table. The instructions for the performance section were given orally in English. Frontera testified that he did not understand all of the instructions and that he did not ask any questions. The examiner who administered the performance section of the examination testified that nothing was said at the examination concerning the tools the applicants could use, and that instructions were that the applicants were to build the object shown in a sketch given the applicants within a specified time.
 
 
 14
 Concerning the written section of the test, Frontera testified that he was unable to understand several of the words in the questions. He was cross- examined concerning several of the test questions and testified that he did not know what "beading work" was, nor what "factory or shop lumber" was. Concerning the statement "Cedar wood is considered to be decay resisting," he testified that he did not understand the meaning of the word "decay." It should be noted that the words or terms that Frontera indicated that he did not understand dealt with the craft of carpentry. The test did not require verbal ability unrelated to the craft of carpentry.
 
 
 15
 The plaintiffs' statistical evidence, based upon the 1970 census, indicated that persons of Spanish nationality comprised 1.86% Of the Cleveland population and 1.22% Of the Cuyahoga County population. There were 545 Spanish-speaking craftsmen and kindred workers residing in the city of Cleveland. (Pl. Exh. A & M). In 1973, Spanish surnamed Americans comprised approximately .5% Of the employees of the city of Cleveland, but none of the 574 craft positions were filled by Spanish surnamed Americans.
 
 
 16
 There was no statistical evidence of the number of Spanish surnamed Americans employed by the city of Cleveland in 1970 and no evidence of comparative pass rates for Spanish surnamed and other applicants, other than for the May, 1970 craft examinations.
 
 
 17
 The evidence was to the effect that Frontera was the only Spanish surnamed applicant taking the May, 1970 craft examinations; that witnesses involved in placing Spanish surnamed Americans for employment believed that more Spanish surnamed people would apply to take the Civil Service examinations if they were given in Spanish; and that some Spanish surnamed craftsmen who were witnesses would, in fact, apply to take the examinations if they were given in Spanish. The District Court was of the view that the failure to give Civil Service tests in Spanish does have a discriminatory impact on the Spanish speaking population.[2] Only one permanent appointment was made from the Civil Service list resulting from the May, 1970 carpenter's examination. The permanent appointment was made November 2, 1970 to the person receiving the highest grade. Frontera was furloughed from his job on November 20, 1970 in a massive layoff of employees due to the city's poor financial situation. Frontera's temporary job as carpenter at the airport has never been filled and the job has been eliminated as unnecessary.
 
 
 18
 In considering this case we are mindful of several facts which help to place the case in perspective. First, although Frontera criticizes the manner in which the test was constructed, his real complaint relates only to the language in which the test was advertised and administered. Second, there is no training program for carpenters hired from the Civil Service list. Carpenters are expected to possess the professional knowledge of the trade when they are hired. Third, the examination did not require a general proficiency in the English language. It used words and terms which ordinarily would be recognized and understood by a person knowledgeable in the carpentry trade.
 
 
 19
 The principle issue in this case is whether the Fourteenth Amendment and 42 U.S.C. §§ 1981 and 1983 require that information concerning a Civil Service examination be disseminated and the examination itself be administered in Spanish to Spanish-speaking applicants. We hold that they do not. This suit was not brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. or the 1972 amendments 42 U.S.C. § 2000e(a) and (b). We therefore have not considered these statutes and express no opinion with respect to them.
 
 
 20
 The District Judge was of the view that conducting the test in English does have some discriminatory effect upon the Spanish-speaking portion of the city's population. He held that his finding cast upon the defendants the burden of proving that there was a compelling governmental interest in giving Civil Service examinations in English. The Court reviewed the evidence and found that the defendants had met their burden of proof and established a compelling state interest in conducting the test in English. We agree.
 
 
 21
 The Court relied on Article XV Section 10 of the Constitution of Ohio which provides:
 
 
 22
 Appointments and promotions in the civil service of the state, the several counties, and cities, shall be made according to merit and fitness, to be ascertained, as far as practicable, by competitive examination . . .
 
 
 23
 Before Civil Service, the spoils system was in vogue where patronage was dispensed by the political party in power. The elimination of this practice was of such great importance to the people of Ohio that they dealt with it in their Constitution.
 
 
 24
 Circuit Judge Levin Campbell who wrote the opinion for the Court in Boston Chapter N. A. A. C. P., Inc. v. Beecher, 504 F.2d 1017, 1022 (1st Cir. 1974) indicated that we ought not to discourage the use of tests and reopen the doors to political selection. He stated:
 
 
 25
 In fairness to the state, we must not forget that civil service tests were instituted to replace the evils of a subjective hiring process. Little will be gained by minorities if courts so discourage the use of tests that the doors to political selection are reopened. Moreover, a test, even one the cutoff of which does not demonstrably predict job performance, may serve worthwhile goals in gross by sifting from the pool of potential applicants those without enough motivation even to try to acquire the skills the test demands, and by discarding some few candidates who take the test but whose mental ability is so low that they are obviously unsuitable. Finally, it is virtually impossible for an employer to justify to a mathematical certainty every selection device.
 
 
 26
 As we noted earlier, the words and terms which Frontera was unable to understand would ordinarily be recognized and understood by a person knowledgeable in the craft. Since there is no training program for carpenters or others in the skilled trades, and the requirements for applicants set out in the announcement include the requirement of carpentry experience, the Commission could assume that an applicant would be familiar with such terminology. At the very least, use of such terminology would not ordinarily interfere with the test's objective of identifying competent carpenters and ranking them for Civil Service.
 
 
 27
 The Commission contended that it would be unreasonable to expect it to translate examinations into the various languages prevalent in a cosmopolitan community. The testimony of employees of the Commission clearly revealed the limited resources of the Commission. The Commission further contended that any form of test, other than a written test, would tend to interject the subjective judgment of examiners into the scoring process and could be manipulated to achieve the very sort of discrimination which the plaintiffs alleged. Essentially the Commission claimed that the Civil Service system itself required the use of English, generally, for its successful operation. There is not an iota of evidence tending to prove that the Commission, in conducting the examination in English, discriminated against the plaintiff on account of his nationality or against any other nationality.
 
 
 28
 The findings of fact adopted by the District Court that plaintiff had established a prima facie case of discrimination are not supported by substantial evidence and are clearly erroneous.
 
 
 29
 If Civil Service examinations are required to be conducted in Spanish to satisfy a few persons who might want to take them, what about the numerous other nationality groups which inhabit metropolitan Cleveland? These other nationality groups would have just as much right as Frontera to have their examinations conducted in their own languages. The city could not conduct examinations in Spanish and deny other nationalities the same privilege. Denial to any would be invidious discrimination.
 
 
 30
 In order to accommodate all nationality groups, the city might be compelled to establish a department of languages with a staff of linguists to translate the tests and supervise them. This would, of course, be at the expense of the city which has severe financial problems at the present time and would ultimately be saddled upon the harried taxpayers of Cleveland.
 
 
 31
 The District Court in determining the obligations of the Commission should have applied the rational basis test rather than the compelling interest test.
 
 
 32
 As well stated by Mr. Justice Stewart in Dandridge v. Williams, 397 U.S. 471, 486, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970):
 
 
 33
 But the Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all . . . It is enough that the State's action be rationally based and free from invidious discrimination.
 
 
 34
 This is not a proper case in which to subject state action to strict judicial scrutiny. San Antonio Independent Dist. v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).
 
 
 35
 We are not dealing here with a suspect nationality or race.
 
 
 36
 It cannot be gainsaid that the common, national language of the United States is English. Our laws are printed in English and our legislatures conduct their business in English. Some states even designate English as the official language of the state, e. g. 127 Ill.Rev.Stat. § 177. Our national interest in English as the common language is exemplified by 8 U.S.C. § 1423, which requires, in general, English language literacy as a condition to naturalization as a United States citizen.
 
 
 37
 Statutes have been enacted which provide exceptions to our nation's policy in favor of the English language to protect other interests and carry out the policies of the Fourteenth Amendment,[3] but these exceptions do not detract from the policy or deny the interests the various levels of government have in dealing with the citizenry in a common language.
 
 
 38
 We have not been favored by the plaintiff or any of the amicus curiae with the citation of a single case holding that Civil Service examinations must be conducted in foreign languages whenever requested by a nationality group and that failure to comply with such requests violates the constitutional or civil rights of the individuals composing such group.
 
 
 39
 A somewhat analogous situation was before the Ninth Circuit in Carmona v. Sheffield, 475 F.2d 738 (9th Cir. 1973) where a group of Spanish-speaking citizens claimed that they were denied their constitutional and civil rights because the state of California did not provide them with Spanish-speaking interviewers to assist them in the processing of their claims for benefits of unemployment insurance and did not send out notices and other communications to them in Spanish. The court in rejecting these claims stated:
 
 
 40
 We believe that the additional burdens imposed on California's finite resources and California's interest in having to deal (with) only one language with all its citizens support the conclusion of reasonableness.
 
 
 41
 (Id. 739) citing Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).
 
 
 42
 The decision of the Supreme Court in Lau v. Nichols, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974) relied upon by the plaintiff is inapposite. In that case the San Francisco school system neglected to provide English language instruction to about 1800 students of Chinese ancestry. The court held that this violated a specific statute (42 U.S.C. § 2000d) and guidelines of the Department of Health, Education and Welfare in connection with furnishing federal financial assistance to public school systems. The court stated that it did not reach the Equal Protection Clause argument but relied solely on the statute and guidelines.
 
 
 43
 Frontera did not have a constitutional right to public employment. His poor showing in the examination, ranking 103rd out of 127 applicants who took the test, would hardly justify any court in substituting him for the person who received the highest grade.
 
 
 44
 In conducting the examination in English the Commission violated no constitutional or civil right of Frontera. In our opinion the test was job related. Griggs v. Duke Power Co., 401 U.S., 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).
 
 
 45
 Affirmed.
 
 
 46
 PHILLIPS, Chief Judge (concurring in the result).
 
 
 47
 I concur in the result reached by the majority opinion:
 
 
 48
 1) That no constitutional rights of Damian Frontera, or the Spanish-speaking class he represents, were violated by the failure of defendants to give Frontera an examination in Spanish, or to provide pre-examination announcements, literature and instructions in the Spanish language, under the facts and circumstances of this case;
 
 
 49
 2) That appellants have not established a right of action under 42 U.S.C. §§ 1981, 1983 or 1985; and
 
 
 50
 3) That the judgment of the District Court dismissing the complaint should be affirmed.
 
 
 
 [1]
 These skilled crafts included that of carpenter, painter, steamfitter, steamfitter-welder, bricklayer, cement finisher, electrician, ironworker, plumber, roofer and plasterer
 
 
 [2]
 The evidence is clear that the Commission does not intentionally discriminate against Spanish language persons. Consequently, the effect of English language announcements and testing is better described as having a "disproportionate impact" to eliminate the pejorative connotations of the word "discriminatory." Vulcan Society v. Civil Service Commission, 490 F.2d 387, 391 n. 4 (2nd Cir. 1973); Castro v. Beecher, 459 F.2d 725, 732 (1st Cir. 1972)
 The Commission does not have any policy against conducting examinations in Spanish. In fact, in the 1970 patrolmen's examination announcements, introductions, and other material were furnished in Spanish to those who desired them.
 
 
 [3]
 See, E. g. 42 U.S.C. § 1973b(e), and 42 U.S.C. § 2000d as interpreted by 45 C.F.R. § 80.3(b)(1). The Supreme Court dealt with the former provision in Katzenbach v. Morgan, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), and the latter provision in Lau v. Nichols, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974)