Anibal SOBERAL–PEREZ, Plaintiff,

and

Benito Cortez, Plaintiff-Intervenor,

v.

Richard S. SCHWEIKER, Secretary of Health and Human Services, Defendant.

No. 77 CV 2544 (ERN).

United States District Court, E.D. New York.

Oct. 19, 1982.

Kalman Finkel, The Legal Aid Society, New York City, for plaintiff and plaintiff-intervenor; John E. Kirklin, Arthur J. Fried, Morton B. Dicker, Nancy Haber and Kathleen A. Masters, New York City, of counsel.

Raymond J. Dearie, U.S. Atty., E.D.N.Y. by Robert L. Begleiter, Asst. U.S. Atty., Brooklyn, N.Y., for defendant; Randolph W. Gaines, Natalie Dethloff, Dept. of Health & Human Services, Baltimore, Md., and Robert Varnum, Dept. of Health & Human Services, Washington, D.C., of counsel.

## MEMORANDUM OF DECISION AND ORDER

NEAHER, District Judge.

This is an action for declaratory and injunctive relief, monetary damages, and for review of certain final decisions of the Secretary of Health and Human Services (HHS). Plaintiff and plaintiff-intervenor (hereinafter "plaintiffs"), on behalf of themselves and all others similarly situated, challenge the Secretary's practices, policies and procedures in the disability insurance (DI) and the supplemental security income (SSI) programs administered by the Social Security Administration (SSA) as violative of the Social Security Act, 42 U.S.C. §§ 405(b) and 1383(c) (the Act),[1] the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and the Fifth Amendment Due Process Clause.[2]

---

1. The federal old age, survivors and disability insurance (DI) program, established by Title II of the Social Security Act (the Act), 42 U.S.C. § 401 *et seq.*, provides monthly benefits averaging $320 to approximately 2.9 million disabled workers. The supplemental security income (SSI) program for aged, blind and disabled persons, established by Title XVI of the Act, 42 U.S.C. § 1381 *et seq.*, operates concurrently with the DI program, providing a monthly minimum federal income support level of $208.20 for qualifying individuals. S.Rep. No. 408, 96th Cong., 2d Sess. 11–15, *reprinted in*

[1980] U.S.Code Cong. & Ad.News 1277, 1290–94.

2. The complaints allege violations of both due process and equal protection. But on this motion, plaintiffs do not dispute the Secretary's contention that the complaints fail to state a due process claim and have apparently abandoned it. Upon consideration of defendant's argument, Mem. in Support at 23–36, the Court is of opinion that dismissal of plaintiffs' due process claim is appropriate.

We note in passing that the Supreme Court has construed the Due Process Clause of the

Specifically, the complaints challenge the sufficiency of the Spanish notices and Spanish-speaking personnel presently provided in the DI and SSI programs, claiming that the current SSA practice denies Hispanic [3] applicants and recipients equal access to and meaningful participation in the benefits programs.

The action is now before the Court on the following motions:

(1) Defendant's motion to dismiss certain allegations in the complaints under F.R. Civ.P. 12(b) or, in the alternative, for a protective order under F.R.Civ.P. 26(c);

(2) Plaintiffs' motion for class certification under F.R.Civ.P. 23(c); and

(3) Miguel Caraballo and Alcedo De La Cruz's motions for leave to intervene as plaintiffs in the action under F.R.Civ.P. 24(b).

### FACTS

For purposes of the government's motion to dismiss, the following facts are taken as true. *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In 1947, plaintiff Anibal Soberal-Perez was born in Puerto Rico, and in 1965, after receiving a tenth grade education, he moved to the United States. His dominant language is Spanish, and he is unable to understand the English documents, instructions and advice, detailed below, which were provided him by SSA personnel. After several years of menial employment while suffering from respiratory and psychological impairments, Soberal-Perez applied concurrently for DI and SSI benefits. The initial determination was adverse to plaintiff, and he received written notice in English of his right to a reconsideration. Upon reconsideration, the initial determination was affirmed, and plaintiff received written notice in English of his right to a hearing before an administrative

law judge (ALJ), to be represented by counsel, to present further evidence and to cross-examine adverse witnesses.

On April 19, 1977, Soberal-Perez went to his local SSA office in Brooklyn, New York, and handed an SSA employee the notice of reconsideration and a letter from his doctor. The employee filled out a request for hearing form, asking plaintiff questions which neither he nor his friend whom he had brought to act as translator understood. The employee checked certain boxes on the form adjacent to statements waiving plaintiff's rights to appear and submit further evidence and indicated to plaintiff that he should sign the form, which he did without understanding the nature or meaning of the statements. On July 3, 1977, an ALJ denied plaintiff's claims for benefits, and plaintiff received written notice in English of the grounds for denial and the right to appeal.

Subsequent to the Appeals Council affirmance of the ALJ's decision, this Court remanded the case to the Secretary for further proceedings. A supplemental hearing was held before an ALJ at which a translator was present and plaintiff was represented by his present counsel. By decision dated December 14, 1979, the Appeals Council adopted and partially modified the findings and conclusions of the ALJ, holding that plaintiff is entitled to neither DI nor SSI benefits.

Plaintiff-intervenor Benito Cortez, approximately 58 years old, presents similar circumstances: minimal education in his native Puerto Rico; insufficient ability to communicate in English to understand SSA procedures; menial employment in the United States; circulatory and osteoarthritic impairments; and denial of disability benefits with unknowing waiver of procedural rights. However, unlike Soberal-Per-

---

Fifth Amendment as incorporating the equal protection principles embodied in the Fourteenth Amendment. *Hampton v. Wong,* 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976); *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

**3.** The Court adopts the following definition of "Hispanic":

"Pert[aining] to or deriving from the people, speech, or culture of Spain or of Spain and Portugal; often, specif[ically], Latin-American." Webster's New International Dictionary 1182 (2d ed. 1960).

ez, upon this Court's order of remand, and subsequent to a supplemental hearing with a translator present, Cortez' claims were allowed. In a decision dated August 29, 1980, the Appeals Council adopted the ALJ's decision, and pursuant thereto Cortez was placed in payment status with retroactive payments for the period beginning April 1977.

Movant Alcedo De La Cruz was born in the Dominican Republic in 1903. He too speaks primarily Spanish and is unable to understand the instructions and advice provided by SSA personnel. In August 1975, De La Cruz applied for SSA retirement benefits, and an application for SSI benefits was completed for him as well. He began receiving SSI benefits, and upon the advice of SSA personnel returned to work for a sufficient number of quarters to qualify for retirement benefits. By notice dated April 4, 1980, De La Cruz was informed that his earnings subsequent to August 1975 had not been properly included in his SSI computation, and that the overpayments would be recovered from his future checks. He requested a waiver of recovery of the overpayments by the SSA, based on his lack of understanding of the reporting requirements, but the ALJ ruled, after a hearing at which a translator was present and plaintiff was represented by his present counsel, that he was at fault in causing the overpayments. When the Appeals Council denied plaintiff's request for review of the decision, the denial of his claim for waiver of recovery became a final decision of the Secretary.

Movant Miguel Carballo was born in 1928 and moved to the United States after receiving an eighth grade education in Puerto Rico. Carballo worked as a cook for 25 years prior to applying for SSI and DI benefits for disability stemming from severe diabetes and a diabetic coma suffered in 1968. After separate hearings, Carballo was denied DI benefits and found eligible for SSI benefits. On reapplication for DI, Carballo was provided a translator at the hearing, but his claim was again denied, and the Appeals Council affirmed the denial. Carballo failed to bring a civil action for review of the agency action within the jurisdictional 60-day period after the Secretary's final decision and now claims that his failure was due to the absence of Spanish notices or instructions regarding the right to appeal. By stipulation and order filed June 3, 1982, Carballo's claim was remanded to the Secretary for further proceedings.[4]

## JURISDICTION

■ The Government challenges plaintiffs' assertion that the Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1361, arguing that 42 U.S.C. § 405 affords the exclusive basis for jurisdiction over the claims presented.[5]

---

**4.** Defendant objects to the intervention of Carballo on the basis of his failure to comply with the 60-day jurisdictional time limit for seeking judicial review of the Secretary's decision. *See* 42 U.S.C. § 405(g); 20 C.F.R. § 422.210 (1981). However, this argument is based on the Secretary's position that § 405(g) provides the sole predicate for jurisdiction in this action. Since the Court holds that 28 U.S.C. § 1361 is also an available jurisdictional base, this argument must fail. Nevertheless, this Court also holds, on the merits, that there are no grounds for plaintiffs' constitutional and statutory claims, which would have supported mandamus jurisdiction over the applicant's complaint. Hence, Carballo's remaining request for a review of a final decision of the Secretary must be dismissed pursuant to § 405(g).

**5.** The government also challenges plaintiffs' contention that general federal question jurisdiction also exists over their complaint. In several strongly worded opinions, the Supreme Court has apparently resolved this issue in favor of the government's position. *Califano v. Sanders,* 430 U.S. 99, 109, 97 S.Ct. 980, 986, 51 L.Ed.2d 192 (1977); *Mathews v. Eldridge,* 424 U.S. 319, 327, 96 S.Ct. 893, 899, 47 L.Ed.2d 18 (1976); *Weinberger v. Salfi,* 422 U.S. 749, 760–61, 95 S.Ct. 2457, 2464–65, 45 L.Ed.2d 522 (1975). The issue, however, remains controversial. *Compare St. Louis Univ. v. Blue Cross Hosp. Serv.,* 537 F.2d 283, 292 (8th Cir.), *cert. denied,* 429 U.S. 977, 97 S.Ct. 484, 50 L.Ed.2d 584 (1976) (procedural challenges are not claims "to recover" benefits and may therefore be grounded on § 1331), *and Humana of S.C., Inc. v. Califano,* 590 F.2d 1070, 1080–81 (D.C. Cir.1978) (same) *with Trinity Memorial Hosp. of Cudahy, Inc. v. Associated Hosp. Serv., Inc.,* 570 F.2d 660, 667 (7th Cir.1977) (§ 405(h) precludes § 1331 jurisdiction but not suit in the Court of Claims under 28 U.S.C. § 1491);

The issue arises from the language of § 405(h), which appears to restrict review of any decision of the Secretary to the mechanism established by § 405(g).[6] Although the Supreme Court has provided support for broad construction of § 405(h), *see, e.g., Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977); *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), a plain reading of the statute, aided by the recent decision in *Ellis v. Blum,* 643 F.2d 68 (2d Cir.1981), leads to the conclusion that § 1361 is an available jurisdictional basis in this action.

*American Assoc. of Councils of Medical Staffs of Private Hosps., Inc. v. Califano,* 575 F.2d 1367, 1372 (5th Cir.1978), *cert. denied,* 439 U.S. 1114, 99 S.Ct. 1018, 59 L.Ed.2d 72 (1979) (same). While the Second Circuit has indicated that it is "inclined to agree with the Eighth Circuit's decision that [the Supreme Court] did not preclude § 1331 jurisdiction over procedural challenges not necessarily affecting entitlement to benefits," the court decided to avoid the issue once it found jurisdiction under § 1361. *Ellis v. Blum,* 643 F.2d 68, 76–77 (2d Cir.1981). *But see id.* at 84 ("405(h) would not bar a claim for damages against the Secretary predicated on § 1331").

6. 42 U.S.C. § 405(h) provides:
"(h) The findings and decisions of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter."
42 U.S.C. § 405(g) provides in pertinent part:
"(g) Any individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow.... The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing. The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive .... The court may, on motion of the Secretary made for good cause shown

The third sentence of § 405(h) precludes actions "brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter."[7] Thus, to the extent the present claims seek to recover Social Security benefits, federal question jurisdiction is clearly foreclosed. The issue remains, however, whether the declaratory and injunctive relief sought by plaintiffs constitute claims "arising under" the Act.

In three instances the Supreme Court has expressly left open the question whether § 405(h) forecloses mandamus jurisdiction, *Califano v. Yamasaki,* 442 U.S. 682, 698, 99 S.Ct. 2545, 2556, 61 L.Ed.2d 176 (1979);

before he files his answer, remand the case to the Secretary for further action by the Secretary, and it may at any time order additional evidence to be taken before the Secretary, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Secretary shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm his findings of fact or its decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and a transcript of the additional record and testimony upon which his action in modifying or affirming was based. Such additional or modified findings of fact and decision shall be reviewable only to the extent provided for review of the original findings of fact and decision. The judgment of the court shall be final except that it shall be subject to review in the same manner as a judgment in other civil actions."

7. § 405(h), by its terms, affects only claims for benefits under Title II of the Social Security Act. No parallel provision similarly restricts jurisdiction over claims brought under Title XVI seeking SSI benefits; although 42 U.S.C. § 1383(c)(3) provides that review of denials of SSI claims is subject to the judicial review provisions contained in § 405(g). Thus, while the § 405(g) review procedure is applicable to SSI claims denials, it appears that the § 405(h) jurisdictional restriction was not incorporated into SSI-Title XVI. *See Jones v. Califano,* 576 F.2d 12, 17 & n. 8 (2d Cir.1978). *But see Gilchrist v. Califano,* 473 F.Supp. 1102, 1106 (S.D.N.Y.1979) (citing *Jones* for the opposite conclusion). Nevertheless, we need not decide this issue, because of our conclusion that plaintiffs fail to state a constitutional or statutory claim requiring the exercise of federal question jurisdiction.

*Norton v. Mathews,* 427 U.S. 524, 529–30, 96 S.Ct. 2771, 2774, 49 L.Ed.2d 672 (1976); *Mathews v. Eldridge, supra,* 424 U.S. at 332 n. 12, 96 S.Ct. at 901 n. 12, and in three cases the Court of Appeals for this Circuit has held that § 1361 jurisdiction will lie to review SSA benefits claims procedure, *Ellis v. Blum, supra; Barnett v. Califano,* 580 F.2d 28 (2d Cir.1978); *White v. Mathews,* 559 F.2d 852 (2d Cir.1977). Therefore, it is the scope and not the availability of mandamus jurisdiction which remains to be settled in this action.

The Secretary argues the inapplicability of § 1361 based on the discretionary nature of the governmental conduct sought to be compelled.[8] Yet, in the words of Professor Davis, it is only "mandamus medievalism" which prompts the restriction of § 1361 jurisdiction to those claims involving a "plain" right and a "ministerial" or "peremptory" duty. K. Davis, Administrative Law of the Seventies § 23.09, at 543–46 (1976). Nothing in the statute, which confers district court jurisdiction over "any action in the nature of mandamus," provides a basis for resurrecting ancient concepts attached to the common law writ which was abolished by Rule 81(b), F.R.Civ.P.[9] Rather, when read in light of the Administrative Procedure Act provisions governing judicial review of administrative action, 5 U.S.C. §§ 701–06, it becomes clear that the scope of § 1361 jurisdiction must be more flexible than the restrictions inhering in the mandamus writ.

■ The scope of review for *all* cases is established by 5 U.S.C. § 706:

"To the extent necessary to decision . . . the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and . . . shall . . . compel agency action unlawfully withheld . . . [and] set aside agency action found to be . . . an abuse of discretion, . . . contrary to constitutional right, . . . [or] without observance of procedure required by law."

As Professor Davis points out, since Congress did not except actions in the nature of mandamus from the scope of review prescribed by § 706, jurisdiction under § 1361 must extend to enable a federal court in appropriate circumstances to compel or set aside agency action without regard to the availability of mandamus relief at common law:

"Queer and unsatisfactory is the continued verbiage that the scope of review differs in actions in the nature of mandamus from the scope of review in other actions. The scope of review, whether or not mandatory relief is sought, and whether or not it is sought through an action in the nature of mandamus or through mandatory injunction, should be governed by the scope of review provisions of the Administrative Procedure Act." K. Davis, *supra,* at 543.

In sum, the primary flaw in the Secretary's argument lies in its advocacy of premature foreclosure of judicial inquiry: if § 1361 jurisdiction is limited to review of "ministerial" duties, the reviewing court cannot perform the above-quoted required functions under § 706.

■ In each of the three decisions in which the Second Circuit upheld mandamus jurisdiction notwithstanding § 405(h), in no sense could the Secretary's duty thereunder review be characterized as "peremptory" or "ministerial." Indeed, reasoned analysis reveals the folly of attempting to rigidly categorize the spectrum of governmental duties in such manner. In *Barnett* and *White,* the

---

**8.** Added by the Mandamus and Venue Act of 1962, 28 U.S.C. § 1361 provides:

"The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

**9.** F.R.Civ.P. 81(b) provides:

"(b) Scire Facias and Mandamus. The writs of scire facias and mandamus are abolished. Relief heretofore available by mandamus or scire facias may be obtained by appropriate action or by appropriate motion under the practice prescribed in these rules." *But see* 1 Moore's Federal Practice ¶ 0.62[17], at 700.49–51 (2d ed.1981) (arguing for a narrower construction of 28 U.S.C. § 1361).

plaintiffs challenged the "glacial pace" of SSA adjudication of disability benefits claims. In *Ellis,* as previously discussed, the Secretary's authorization of certain forms of pretermination notice was at issue. In all three cases, the nature of the duty challenged did not preclude exercise of mandamus jurisdiction. It appears, then, that the law in this Circuit does not incorporate within § 1361 the common law mandamus requirement that the duty sought to be compelled must be ministerial or peremptory. Rather, when a constitutional duty is alleged, the court obtains a § 1361 jurisdiction, and it may compel compliance with such duty after determining its substance.

In *Elliott v. Weinberger,* 564 F.2d 1219 (9th Cir.1977), *aff'd in part, rev'd in part sub nom. Califano v. Yamasaki,* 442 U.S. 682, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979), the Court of Appeals for the Ninth Circuit noted that mandamus lies both to determine the constitutional requirements applicable to SSA procedure as well as to compel compliance with such requirements:

> "In *Knuckles v. Weinberger,* 511 F.2d 1221 (9th Cir.1975) and in *Workman v. Mitchell,* 502 F.2d 1201 (9th Cir.1974), this Circuit has held that mandamus lies both to compel compliance with due process requirements and to provide the court jurisdiction 'to declare the due process requirement applicable to [the challenged] proceedings.' *Workman, supra,* at 1206.
>
> "The fact that the district courts were required to analyze the Secretary's procedures in light of the fifth amendment in order to rule on the appropriate form of notice and hearing, does not render the Secretary's duty so unclear as to be beyond the reach of mandamus. '[O]nce the court interprets the law, the defendant's duty will be clear; the court is not telling the defendant how to exercise his discretion.' *Knuckles, supra,* at 1222." 564 F.2d at 1226.

Examining the circumstances at hand, it is clear that § 1361 jurisdiction lies. Plaintiffs seek, in part, a declaration of the constitutional principles regarding the alleged class' right to receive bilingual notice of SSA determinations and review procedure. As the Court of Appeals stated in *White,* "the scope of the Secretary's discretion is the very issue before us." 559 F.2d at 856. Thus, we have jurisdiction under § 1361 to determine the existence of the constitutional duty and to review the agency action within the scope provided by the Administrative Procedure Act.

## TITLE VI CLAIMS

■ Arguing for dismissal of plaintiffs' claim for relief based upon § 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d,[10] the Secretary raises a novel issue: whether the statutory proscription against "discrimination under any program or activity receiving Federal financial assistance" is applicable to direct federal payment programs such as the DI and SSI programs. In the only relevant reported decision, *Bob Jones University v. Johnson,* 396 F.Supp. 597 (D.S.C.1974), *aff'd mem.,* 529 F.2d 514 (4th Cir.1975), the district court addressed the issue in one sentence of obiter dictum:

> "Admittedly, cash payments made by the federal government which may be utilized without restriction, and which are not dependent upon an individual beneficiary's participation in any program or activity (*e.g.,* veterans' pensions; old-age survivors and disability benefits under Title II of the Social Security Act), are not within the coverage of Title VI because such payments would be assistance to the individual and not to a 'program or activity' required by Section 601." 396 F.Supp. at 602 (footnote omitted).[11]

---

**10.** 42 U.S.C. § 2000d provides:

"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

**11.** For support, the court misquoted Senator Hubert Humphrey as stating that social security payments "would not be covered" by Title

Yet however brief the court's treatment in *Bob Jones,* its conclusion is supported by the statutory scheme and legislative history. Although the operative provision, "any program or activity receiving Federal financial assistance" does not unambiguously preclude application of § 2000d to direct programs, the enforcement mechanism established in § 2000d-1 [12] clearly indicates that Title VI applies only where the federal government funds an intermediate non-federal recipient [13] who discriminates against an ultimate beneficiary. The language of the first sentence of § 2000d-1 is instructive:

"Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 2000d

VI. *See* 396 F.Supp. at 602, n. 16. As discussed herein, the Senator's remarks, while not so distinctly phrased, support a statutory construction which excludes direct federal benefits programs from Title VI coverage.

**12.** 42 U.S.C. § 2000d-1 provides:
"Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 2000d of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made and, shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law: *Provided, however,* That

of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken."

In no uncertain terms, § 2000d-1 establishes the coverage of § 2000d. No mention is made of programs receiving direct budgetary funding through federal legislation. Rather, § 2000d-1 focuses only on federal entities which "extend" financial aid through "grant, loan, or contract." While in a sense the DI and SSI programs receive financial "assistance" from the federal government, funding for these programs is provided not through loan, grant or contract, but through the social security payroll tax (DI) and appropriations from general revenues (SSI). S.Rep. No. 408, 96th Cong.,

no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report."

**13.** In the Department of HHS regulations promulgated to effectuate the provisions of Title VI of the Civil Rights Act, "recipients" of federal financial assistance are defined as non-federal:
"The term 'recipient' means any State, political subdivision of any State, or instrumentality of any State or political subdivision, any public or private agency, institution, or organization, or other entity, or any individual in any State, to whom Federal financial assistance is extended, directly or through another recipient, for any program, including any successor, assign, or transferee thereof, but such term does not include any ultimate beneficiary under any such program." 45 C.F.R. § 80.13(i) (1982).

2d Sess. 11, *reprinted in* [1980] U.S.Code Cong. & Ad.News 1227, 1290. Thus, the clear qualifying language in § 2000d–1 leaves no doubt that the term "program" in § 2000d cannot *refer* to the DI and SSI programs, funded directly by Congress, but only to those programs receiving aid by grant, loan or contract from a federal department or agency.

Further, the third sentence of § 2000d–1 allows the disbursing federal agency to effect compliance with the substantive restriction in § 2000d by terminating *or* refusing to grant assistance. The clear import of this measure, as well as the proviso regarding procedure prior to terminating federal aid, see note 12, is enforcement of Title VI *by* federal agencies *against* nonfederal entities. Congress made no provision for enforcement against direct federal benefit programs operating within federal departments or agencies.

Logic dictates that Congress would have developed an analogous enforcement mechanism to supplement the procedure outlined in § 2000d had it been concerned with federal agencies utilizing Title VI to police their internal direct benefits programs. Instead, the statute *refers* to only two alternative measures for effecting compliance: (1) "any other means authorized by law," which has been interpreted to include reference to the Department of Justice and any appropriate proceeding under local or State law, 45 C.F.R. § 80.8(a); and (2) informal attempts to secure compliance by voluntary means. 42 U.S.C. § 2000d–1. It need hardly be said that internal regulation of a department's direct benefits program would require a completely distinct perspective and procedural mechanism than that present in § 2000d–1. The legislative omission cannot be deemed insignificant.

For support of the view that Title VI has no application to direct programs of the federal government we need look no further than the remarks made by Senator Hubert Humphrey, one of the sponsors of the bill, on the Senate floor:

"It, therefore, is important to be quite clear as to just what title VI would and would not do. In terms, it applies to well over a hundred different Federal assistance programs. In fact, however, its effect will be much more limited.

"Perhaps the greatest amount of Federal assistance funds goes for direct programs, in which Federal funds are paid directly by the United States to the ultimate recipient, such as social security payments, veterans' compensation and pensions, civil service and railroad retirement benefits. Contrary to assertions that have been made, title VI will have no practical effect on such programs, for two reasons. First, the Federal Government does not engage in racial discrimination in determining eligibility for and paying out benefits under such programs. It could not. Neither the statutes authorizing them, nor the fifth amendment to the Constitution, would permit such discrimination. Second, title VI would not authorize the withholding of any of these direct payments on the ground that the recipient engages in racial discrimination in connection with his business or other activities. It is irrelevant, to the purpose of these acts, what the recipient does with the money he receives. His employees, the customers of his business, or other persons with whom he deals, are in no sense participants in or beneficiaries of these Federal programs." 110 Cong.Rec. 6544–45 (1964).

Although Senator Humphrey's explanation of the scope of Title VI lacks the clarity he intended and we might desire, the fundamentals appear sufficiently evident. For instance, the reference to "practical effects" leaves open nice distinctions between applicability and pragmatic impact of the law. Likewise, conclusory statements that the federal government "does not" and "could not" engage in discriminatory practices are far from helpful in the present circumstances. Yet, the Senator's remarks clearly establish the concept that the Social Security Act and the Fifth Amendment provide the necessary avenues for protection against discrimination by the SSA, rendering needless the application of

the Civil Rights Act. Moreover, immediately following his discussion of the impact on direct programs, Senator Humphrey delineated the essential difference with regard to State welfare programs which receive federal grants under the Social Security Act: "[I]t [Title VI] will result in requirements that the State agencies administering these programs refrain from racial discrimination in the allowance of benefits and the treatment of beneficiaries." *Id.* at 6545. Thus, in the critical exposition in the legislative debate on the scope of Title VI, a direct comparison was made between direct programs and federally assisted State programs. The express reference to the anti-discriminatory effect of the statute on State programs, in conjunction with the portrayal of its inapplicability to direct federal programs, ineluctably leads to the conclusion that the latter are excluded from the broad sweep of § 2000d. *See also,* 110 Cong.Rec. 6562, 8424–26, 13380 (1964).

Accordingly, dismissal of plaintiffs' claim based upon 42 U.S.C. § 2000d is appropriate.

## EQUAL PROTECTION CLAIMS

Plaintiffs in this case assert a broad and fundamental attack on the constitutionality of monolingual governmental programs.[14] Essentially, plaintiffs' equal protection claim contends that the Constitution requires the State and federal governments to provide foreign language services whenever "a language barrier exists between a particular group and the particular [governmental] benefit sought, be it a cash benefit, job

or other right." Memorandum for Plaintiffs at 36. They argue that failure to supply materials in the primary language of a governmental beneficiary, in this case Spanish forms and interpreters, constitutes discrimination on the basis of national origin. While this Court appreciates the difficulty recent immigrants may initially encounter with the English language, for the reasons stated below, we cannot say that the Constitution mandates a multilingual government.

■ The threshold determination in equal protection analysis is the governmental basis for the classification at issue. As the Supreme Court recently explained in *Phyler v. Doe,* its previous decisions have established essentially two tiers of equal protection review,[15] the application of which depends on whether the challenged classification either expressly or implicitly differentiated on grounds "inconsistent with elemental constitutional premises." —— U.S. ——, 102 S.Ct. 2382, 2384, 72 L.Ed.2d 953 (1982). A court must initially determine whether the classification "operates to the disadvantage of some suspect class or impinges upon a fundamental right." *San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973). If so, the court must strictly scrutinize the governmental conduct, omitting application of the "usual presumption of validity" and requiring the government to come forward with compelling justification. If not, the classification must "be examined to determine whether it

---

**14.** Plaintiffs attempt to contain the broad implications of their argument by contending that only where a minority group is sufficiently large would language services be mandated by the Constitution. The size of the minority, however, is irrelevant for equal protection purposes. Quite simply, the concept of equal protection would be stood on its head if only "major" minorities were entitled to its protection. *See Frontera v. Sindell,* 522 F.2d 1215 at 1219 (6th Cir.).

**15.** An intermediate test has been applied to certain types of legislative classifications such as gender and illegitimacy. *Phyler v. Doe,* —— U.S. ——, 102 S.Ct. 2382 at 2395 & n. 5, 72 L.Ed.2d 953. Apparently, this analysis obtains

when a classification thrusts a disability on a group because of their unalterable status at birth. *See id.* 102 S.Ct. at 2398 (denial of public education to the children of illegal aliens subject to intermediate test because it "imposes a lifetime hardship on a discrete class of children not accountable for their disabling status"); *Trimble v. Gordon,* 430 U.S. 762, 770, 97 S.Ct. 1459, 1465, 52 L.Ed.2d 31 (1977); *Weber v. Aetna Casualty & Surety Co.,* 406 U.S. 164, 175, 92 S.Ct. 1400, 1406, 31 L.Ed.2d 768 (1972). Although learning English may be "lifetime hardship," unlike illegitimacy or gender inability to speak English is not a status fixed at birth.

rationally furthers some legitimate, articulate [governmental] purpose and therefore does not constitute an invidious discrimination." *Id.*

■ Since the Supreme Court, in *Weinberger v. Salfi,* 422 U.S. 749, 772, 95 S.Ct. 2457, 2470, 45 L.Ed.2d 522 (1975), concluded that "a noncontractual claim to receive funds from the public treasury" does not enjoy the constitutionally protected status of fundamental rights such as the right to raise one's children, *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), or the right to personal choice in matters of family life, *Cleveland Bd. of Ed. v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974), the critical issue in this case is whether the current SSA practices operate to the disadvantage of a "suspect class." While there can be no question that Hispanic persons as an ethnic group constitute such a class for equal protection purposes, *Keyes v. School Dist. No. 1,* 413 U.S. 189, 197, 93 S.Ct. 2686, 2691–92, 37 L.Ed.2d 548 (1973), it is also clear that the SSI procedures alleged to be discriminatory are not on their face based upon ethnic origin. Rather the allegedly discriminatory classification is based on language; that is, if a classification exists, it is not non-Hispanic/Hispanic, but English speaking/non-English speaking. While ethnic groups like Hispanics are often characterized by language, unlike race or national origin, language, *per se,* is not a characteristic protected by the Constitution from rational differentiation. *See, e.g., Frontera v. Sindell,* 522 F.2d 1215, 1219 (6th Cir.1975); *Carmona v. Sheffield,* 475 F.2d 738, 739 (9th Cir.1973). As the district court in *Carmona v. Sheffield,* 325 F.Supp. 1341 aptly noted:

> "The breadth and scope of such a [contrary] contention is so staggering as virtually to constitute its own refutation. If adopted in as cosmopolitan a society as ours, enriched as it has been by the immigration of persons from many lands with their distinctive linguistic and cultural heritages, it would virtually cause the processes of government to grind to a halt. The conduct of official business, including the proceedings and enactments of Congress, the Courts and administrative agencies, would become all but impossible. The application of Federal and State statutes, regulations and proceedings would be called into serious question." 325 F.Supp. at 1342.

Nevertheless, it is of course true that the SSI regulations, although neutral on their face, can constitute discrimination based upon race or national origin if the regulations have an intentionally disproportionate impact on a minority group. *See, e.g., Arlington Heights v. Metropolitan Hous. Corp.,* 429 U.S. 252, 265–66, 97 S.Ct. 555, 563–64, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 241–42, 96 S.Ct. 2040, 2048–49, 48 L.Ed.2d 597 (1976); *Keyes v. School Dist. No. 1,* 413 U.S. at 201–03, 93 S.Ct. at 2694–95. Plaintiffs, however, do not allege that the Secretary promulgated SSI regulations with the intent to deprive Hispanics of governmental benefits. They argue instead that under several Second Circuit school desegregation decisions a "presumption of segregative purposes" arises when "the natural, probable and foreseeable result" of an agency action or inaction is a disproportionate adverse impact on a racial or ethnic minority group. *Arthur v. Nyquist,* 573 F.2d 134, 142–43 (2d Cir.), *cert. denied sub nom. Manch v. Arthur,* 439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 169 (1978); *Hart v. Community School Bd. of Ed.,* 512 F.2d 37, 51 (2d Cir.1975). Although these cases indicate that foreseeability of disparate consequences is relevant on the issue of discriminatory intent, at least in school desegregation cases, *Lora v. Board of Ed.,* 623 F.2d 248, 250 (2d Cir.1980), foreseeability in itself is merely an inference and insufficient to demonstrate invidious discrimination. *Personnel Admin. v. Feeney,* 442 U.S. 256, 279 n. 25, 99 S.Ct. 2282, 2296 n. 25, 60 L.Ed.2d 870 (1979); *Dayton Bd. of Ed. v. Brinkman,* 443 U.S. 526, 527 n. 9, 99 S.Ct. 2971, 2978 n. 9, 61 L.Ed.2d 720 (1979); *Columbus Bd. of Ed. v. Penick,* 443 U.S. 449, 464, 99 S.Ct. 2941, 2950, 61 L.Ed.2d 666 (1979).

As the Supreme Court has defined it, discriminatory purpose "implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Admin. v. Feeney,* 442 U.S. at 279, 99 S.Ct. at 2296. The burden of proving, and hence alleging, this subjective element of discriminatory intent remains on the plaintiff. *Lora v. Board of Ed.,* 623 F.2d at 251; *see* F.R.Civ.P. 9(b). In fact, the Court's decision in *Feeney* indicates that foreseeability of disproportionate impact, however great, fails to indicate an improper purpose when a believable and historical non-discriminatory explanation exists for the governmental procedures. *Personnel Admin. v. Feeney,* 442 U.S. at 281, 99 S.Ct. at 2297; *see Bryan v. Koch,* 492 F.Supp. 212, 219 (S.D.N.Y.), *aff'd,* 627 F.2d 612 (2d Cir.1980).

In this case the valid historical basis and modern rationale for conducting governmental affairs in English is clear: the national language of the United States is English. As the Sixth Circuit noted in a case similar to this:

> "Our laws are printed in English and our legislatures conduct their business in English. Some states even designate English as the official language of the state, e.g. 127 Ill.Rev.Stat. § 177. Our national interest in English as the common language is exemplified by 8 U.S.C. § 1423, which requires, in general, English language literacy as a condition to naturalization as a United States citizen." *Frontera v. Sindell,* 522 F.2d at 1220.

The complaint therefore simply calls the Secretary to task for policies and practices that have objective rationality and historical justification.[16] Absent allegations or reasons other than a disproportionate im-

pact, there is no basis to infer antipathy on the part of the Secretary. Consequently, the SSA procedures are not subject to strict scrutiny, *id.* at 1218; *Carmona v. Sheffield,* 475 F.2d at 739 (citing *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970)), and must be presumed racially and ethnically neutral. *Personnel Admin. v. Feeney,* 442 U.S. at 273, 99 S.Ct. at 2293; *Vance v. Bradley,* 440 U.S. 93 at 97, 99 S.Ct. 939 at 942, 59 L.Ed.2d 171.

Once it is determined that a government action does not intentionally discriminate against a suspect class nor infringe the exercise of a fundamental right, the only question remaining is whether the legislative classification bears a rational relationship to a legitimate governmental purpose. *Vance v. Bradley,* 440 U.S. at 97, 99 S.Ct. at 942. Given the universality of the English language in the affairs of government, it cannot be said that HHS procedures are irrational. The cost in time, money and administrative disruption are sufficient justifications under this tier of equal protection analysis. *See Schweiker v. Wilson,* 450 U.S. 221, 238, 101 S.Ct. 1074, 1084–85, 67 L.Ed.2d 186 (1982) ("This Court has granted a 'strong presumption of constitutionality' to legislation conferring monetary benefits, *Mathews v. De Castro,* 429 U.S. 181, 185, 97 S.Ct. 431, 434, 50 L.Ed.2d 389 (1976), because it believes that Congress should have discretion in deciding how to expend necessarily limited resources."). While plaintiffs may feel that such a policy is unwise or inequitable, such belief "is of course an insufficient basis on which to conclude that it is unconstitutional." *Schweiker v. Hogan,* —— U.S. ——, 102 S.Ct. 2597, 2609, 73 L.Ed.2d 227 (1982). Such decisions must be made through the democratic processes, not by order of a federal court. *Vance v. Bradley,* 440 U.S. at 97, 99 S.Ct. at 942; *Carmona v. Sheffield,* 325 F.Supp. at 1344. Ac-

---

**16.** Plaintiffs concede that HHS procedures already provide detailed instructions regarding the provision of foreign language services to claimants who cannot speak or understand English, Plaintiffs' Memorandum of Law at 53, and that "much of what plaintiffs want in the way of forms and notices is presently being provided, at least at the hearing level." *Id.* at 55. In light of these concessions, it is difficult to imagine that the procedures promulgated by the Secretary are somehow motivated by an animus towards Hispanics.

cordingly, plaintiffs' claims under the Fifth Amendment must be dismissed.[17]

Plaintiffs' claims for procedural relief and compensatory damages having been dismissed, all that remains of this action is to review the final HHS decision denying plaintiff Soberal-Perez's claim for DI or SSI benefits. Consequently, there is no basis upon which to maintain a class action and that motion is denied.

■ Similarly, movant De La Cruz's application to intervene in this action no longer presents any claim or defense having "a question of law or fact in common" with the main action and must also be denied. F.R.Civ.P. 24(b). However, De La Cruz's complaint on its face states a claim for a review of the Secretary's final decision denying him a waiver of an overpayment made to him by HHS. In view of that separate controversy, De La Cruz's complaint shall be assigned a separate docket number and treated as originally filed November 9, 1981, the filing date of his notice of motion. However, since it also appears from the complaint and the administrative record that De La Cruz may have failed to comply with the 60-day jurisdictional time limit imposed by 42 U.S.C. § 405(g) and 20 C.F.R. § 422.210 (1981), De La Cruz will be required to show cause within 30 days from the date hereof why his complaint should not be dismissed for lack of jurisdiction.

Accordingly, the Clerk shall open a new civil case file and docket number for the Social Security disability claim of Alcedo De La Cruz, and the administrative record and related papers, if any, shall be transferred to that file.

As above indicated, the claims of plaintiffs Anibal Soberal-Perez and Benito Cortez for procedural relief and compensatory damages are in all respects denied.

SO ORDERED.

---

17. Plaintiffs' claim for compensatory damages must also be dismissed. Insofar as plaintiffs' prayer for relief seeks recovery in tort, the Secretary's decision whether to provide language services is immune from suit under the discretionary function exception of the Federal Torts Claims Act, 28 U.S.C. § 2680(a). Although the Federal Torts Claims Act would not

be a bar to an implied cause of action under the Constitution, *Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980), and perhaps federal question jurisdiction would obtain for such an action despite the language of § 405(h), *Ellis v. Blum,* 643 F.2d at 85, as already discussed, plaintiffs fail to state a claim under the Constitution.